UNITED STATES, Appellee

v.

James C. MORGAN, Staff Sergeant
U.S. Air Force, Appellant.

Nos. 93–1070.
CMR No. 29592.

U.S. Court of Military Appeals.

Argued May 9, 1994.

Decided Sept. 20, 1994.

For Appellant: *Captain J. Knight Champion III* (argued); *Colonel Jay L. Cohen* and *Captain Ursula P. Moul* (on brief); *Colonel Terry J. Woodhouse*.

For Appellee: *Major Barnard N. Madsen* (argued); *Lieutenant Colonel Thomas E. Schlagel* (on brief); *Colonel Jeffery T. Infelise* and *Colonel Richard L. Purdon*.

*Opinion of the Court*

COX, Judge:

This is yet another case in which a military accused is convicted based upon out-of-court declarations of the witnesses against him. The four hearsay statements admitted into evidence arise out of allegations by the victim (appellant's 13–year–old stepdaughter whom we will call Ann—not her real name) that she was raped by appellant, her stepfather.[1]

---

1. In July 1991, appellant was tried by a general court-martial with members at Andrews Air Force Base, Maryland. Contrary to his pleas, appellant was convicted of one specification each of committing indecent acts on a minor, and communicating a threat, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. Appellant was sentenced to a bad-conduct discharge, confinement for 30 months, and reduction to Private E–1. The convening authority approved the sentence.

The Court of Military Review modified the findings as to the indecent acts to conform to what it found the evidence demonstrated beyond a reasonable doubt. It therefore affirmed only so much of the findings as found appellant guilty of committing indecent acts on the victim by touching her buttocks and breasts. The court reassessed the sentence based on the affirmed findings and affirmed only so much of the sentence as provided for a bad-conduct discharge, 24 months' confinement, and reduction to E–1. Unpub. op. at 3 and 4 (April 30, 1993).

We granted review of the following issue:

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN HE RE-

## FACTS

On December 28, 1990, at approximately 1:37 p.m., Ann ran over to the house of her neighbor, Mrs. Vera Riedesel. Seeing that Ann "was very upset." Mrs. Riedesel invited her into her home. Upon questioning the child as to why "she was . . . crying hysterically," the girl replied that "my stepdad raped me." Ann explained that her stepfather (appellant) "went a little bit in . . . [her]" and that he had done the same thing on "three or four other times and once was all the way in." While at Mrs. Riedesel's house, Ann first "tried to call her mother" but "was unable to get her." When these attempts were unsuccessful, "she [called] . . . her aunt" in North Carolina and told her of the alleged rape. The aunt, in turn, called Ann's mother, Mrs. Morgan, who was at work in an office at the base exchange. Mrs. Morgan then telephoned the security police and informed them of the alleged rape.

The security police arrived at Mrs. Riedesel's residence about an hour after the alleged rape. First Lieutenant (Lt.) Baur stated that, when he arrived at the house, the victim was "very quiet" and "very withdrawn." He told Ann he was informed that she had been "sexually molested" by her stepfather and that these were "very serious" allegations. Upon his asking the child if this information was true, she stated that her stepfather did indeed rape her. Lt. Baur and Ann then left Mrs. Riedesel's home and went to the Security Police Headquarters at Andrews Air Force Base, Maryland.

At the security police building, Ann was interviewed by Office of Special Investigations (OSI) Special Agent (SA) Ronald Helms. This statement was reduced to a typewritten document, which was sworn to and signed by Ann. Following this, Ann was taken to the Prince George's County Sexual Assault Center [hereinafter SAC] located in Prince George's General Hospital in Upper Marlboro, Maryland. While at the SAC, Ann gave a statement concerning the alleged rape to Ms. Vicki Turner, a social worker and intake counselor at the center. After speaking with Ms. Turner, Ann was interviewed by Dr. Nainan Thomas (Ph.D. in "human development"), the supervising social worker at the SAC. Ann gave a third statement to Dr. Thomas, detailing a history of sexual abuse by appellant.[2]

In the meantime, Mrs. Morgan, the victim's mother, was interviewed by the Security Police and OSI. She executed a handwritten statement relating the substance of the telephone conversation she had had with her sister. This statement relates that the sister informed Mrs. Morgan that Ann reported that appellant had raped her. A few days later Mrs. Morgan gave a more detailed statement to the OSI, setting forth other incidents of sexual abuse.

At the time of trial, Mrs. Morgan and Ann refused to respond to a number of subpoenas served upon them in North Carolina. The military judge, therefore, issued a warrant of attachment which was served by a U.S. Marshal. Ann and her mother were then returned to Andrews AFB in the custody of a marshal.

At a subsequent hearing, Mrs. Morgan stated under affirmation that she would not testify against appellant. The military judge then declared Mrs. Morgan to be "unavailable" in accordance with Mil.R.Evid. 804(a)(2), Manual for Courts–Martial, United States, 1984, and admitted her prior written statements into evidence under the residual hearsay exception set out in Mil.R.Evid. 804(b)(5). Like her mother, Ann also expressed a desire not to "talk about" what happened with appellant at trial. However, in her testimony on the merits, she identified

---

FUSED TO GRANT TRIAL DEFENSE COUNSEL'S MOTIONS TO SUPPRESS THE PRETRIAL STATEMENTS OF . . . [THE VICTIM—HIS STEPDAUGHTER] AND . . . [HIS WIFE].

We point out to counsel that they are not at liberty to expand upon the statement of the granted issue as set out in the Supplement or as specified by the Court.

2. A medical exam was conducted later that evening. The attending physician found no signs of general physical trauma, anogenital trauma, or of sperm or seminal fluid. The physician did note that Ann had a "perforated" hymen, however.

her prior written statement and acknowledged that "everything ... in that statement ... [was] true." In addition, she acknowledged that appellant fondled her and "put his penis inside ... [her] vagina." Beyond that, she declined to elaborate. Defense counsel cross-examined her extensively.[3] The military judge admitted Ann's various pretrial statements into evidence pursuant to Mil. R.Evid. 803(2), 803(4), and 803(24).

## LAW AND ANALYSIS OF THE STATEMENTS

### I

#### The Victim's Statement to Her Neighbor, Mrs. Riedesel

■ The military judge concluded that Ann's statements to her neighbor, Mrs. Riedesel, were admissible under the excited-utterance exception to the hearsay rule—Mil. R.Evid. 803(2). We agree.

Mil.R.Evid. 803(2) provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \*

(2) *Excited utterance.* A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

Ann's statement to Mrs. Riedesel is a textbook example of an excited utterance. *See generally United States v. Arnold,* 25 MJ 129 (CMA 1987), *cert. denied,* 484 U.S. 1060, 108 S.Ct. 1015, 98 L.Ed.2d 980 (1988). The statement was made soon after the alleged rape while Ann was crying and acting in an hysterical manner. The circumstances ensure the statement was spontaneous and impulsive, and not the product of reflection and deliberation.

### II

#### Victim's Statements to Civilian Social Workers

The military judge determined that Ann's statements to Ms. Vicki Turner and Dr.

Nainan Thomas were admissible in evidence under the medical-treatment exception to the hearsay rule—Mil.R.Evid. 803(4). We accept the conclusions of the military judge.

Mil.R.Evid. 803(4) provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \*

(4) *Statements for purposes of medical diagnosis or treatment.* Statements made for purposes of medical diagnosis or treatment and described medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

■ We note at the outset that applicability of Mil.R.Evid. 803(4) is not limited to statements made to medically licensed doctors. *United States v. Welch,* 25 MJ 23, 25 (CMA 1987); *see United States v. Nelson,* 25 MJ 110, 112 (CMA 1987), *cert. denied,* 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 982 (1988). Given the proper circumstances, statements made to psychologists, social workers, and other health care professionals may well fall within the purview of the medical-treatment exception to the hearsay rule. *United States v. Welch,* 25 MJ at 25. The key factor in determining whether a particular statement is embraced by the medical-treatment exception is "the state of mind or motive of the patient in giving the information to the physician and the expectation or perception of the patient that if he or she gives truthful information, it will help him or her to be healed." *United States v. Clark,* 35 MJ 98, 105 (CMA 1992), *quoting United States v. White,* 25 MJ 50, 51 (CMA 1987). The statement "must be made by a declarant 'for the purpose of medical diagnosis and treatment.'" *United States v. Armstrong,* 36 MJ 311, 313 (CMA 1993), *quoting* 25 MJ at 112.

---

**3.** Despite Ann's failure to testify in her own words at trial, the defense was given an opportunity to cross-examine her concerning the alleged rape and each of her prior written statements.

Here the military judge found as a matter of fact that the admitted statements were "made for the purpose of medical diagnosis or treatment." Evidence in the record supports this finding in that it shows that Ms. Turner and Dr. Thomas explained to the child that the SAC was a "place where people can come" to get help with "their problems" and that their roles as social workers was to ensure her physical and emotional well-being. Similarly, there was testimony by the child indicating she understood that the purpose of the SAC is to help sexual abuse victims like herself. During the interviews the victim continually sought counseling regarding her emotions and fears about pregnancy, and the ramifications her allegations of sexual abuse might have on her family and home life. She also expressed an interest in receiving "follow-up" counseling in the future. While there is some evidence in the record to suggest that Ann spoke to Ms. Turner and Dr. Thomas because she thought she had to as part of the investigatory process, we are not prepared to say the military judge's findings of fact are "unsupported by the evidence" or "clearly erroneous." *United States v. Middleton,* 10 MJ 123, 133 (CMA 1981); *see also United States v. Burris,* 21 MJ 140, 145 (CMA 1985). Accordingly, we hold the military judge did not err in finding that Ann's statements to Ms. Turner and Dr. Thomas were admissible under Mil.R.Evid. 803(4).

## III

### *The Victim's Statement to OSI*

A few hours after the alleged rape Ann gave a statement to OSI Special Agent Ronald Helms at the Andrews AFB security police building. The statement was reduced to a typewritten document, which was sworn to and signed by her. The military judge determined the statement was admissible in evidence under the residual hearsay exception set out in Mil.R.Evid. 803(24).

Mil.R.Evid. 803(24) provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \*

(24) *Other exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence....

Ann's statement to the OSI concerns the circumstances of the alleged rape. There is no question that it is relevant "evidence of a material fact." Mil.R.Evid. 803(24); *see* Mil.R.Evid. 401 and 402. Although the child was reluctant to testify at trial about the details of the alleged rape, she did agree to adopt her written statement and did certify to its truth while under oath. The written statement, albeit hearsay, therefore, was the functional equivalent of the direct testimony of the accusatrix. Absent the actual, spoken testimony of the child, we believe her statement to the OSI was "more probative" on the issue of whether the alleged rape actually occurred than would be any other evidence reasonably available to the Government.

The "interests of justice" clause "has not proved significant in decisions construing" Mil.R.Evid. 803(24), *United States v. Hines,* 23 MJ 125, 134 (CMA 1986). However, the issue of reliability must be resolved, and we now turn to it.

When the Confrontation Clause of the Sixth Amendment is not at issue,[4] the military judge may consider all relevant facts in determining whether the "equivalent circumstantial guarantees of trustworthiness" requirement of Mil.R.Evid. 803(24) is met. *United States v. McGrath,* 39 MJ 158, 166 (CMA 1994); *see United States v. Valdez–*

4. Since Ann was subject to full and effective cross-examination at trial, the Confrontation Clause is not implicated in this case with regard to Ann's out-of-court statements. *See infra.*

**410**

*Soto,* 31 F.3d 1467 (9th Cir.1994).[5] In this case a number of factors support the reliability of Ann's statement to the OSI. First, she signed her statement under oath. Second, she did not recant her statement when given the opportunity at trial, but rather, certified as to its truth. Third, the statement was made to the OSI less than 6 hours after the alleged attack. Fourth, no cogent motivation was suggested for the child to lie. Fifth, the statement was entirely consistent with her excited utterance to the neighbor. And finally, Ann was a member of the accused's household and looked to him for financial support. The societal stigma that undoubtedly attached to her as a result of her accusations of sexual abuse must be considered as nothing less than personally devastating.

In light of the above, we find Ann's statement to the OSI to be particularly worthy of belief and hold that the military judge did not err when he admitted the statement under Mil.R.Evid. 803(24).

■ We likewise find that appellant's right to confront the victim was not violated. The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The central purpose behind this Constitutional provision is to prevent "paper trials" and to allow the accused an adequate opportunity to cross-examine adverse witnesses. *United States v. Owens,* 484 U.S. 554, 557, 108 S.Ct. 838, 841, 98 L.Ed.2d 951 (1988); *California v. Green,* 399 U.S. 149, 157, 90 S.Ct. 1930, 1934, 26 L.Ed.2d 489 (1970). Although the Supreme Court has "recognized that hearsay rules and the Confrontation Clause are generally designed to protect similar values," the Court has

> been careful not to equate the Confrontation Clause's prohibitions with the general rule prohibiting the admission of hearsay

statements. The Confrontation Clause, in other words, bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule.

*Idaho v. Wright,* 497 U.S. 805, 814, 110 S.Ct. 3139, 3145–46, 111 L.Ed.2d 638 (1990) (citations omitted).

Although the Confrontation Clause may sometimes limit admissibility "of some evidence that would otherwise be admissible under" the Military Rules of Evidence, there is no confrontation issue when the declarant testifies as a witness and is "subject to unrestricted cross-examination" by opposing counsel. *United States v. Owens,* 484 U.S. at 560, 108 S.Ct. at 843; *California v. Green,* 399 U.S. at 159, 90 S.Ct. at 1935–36; *United States v. Lyons,* 36 MJ 183, 188 (CMA 1992) (Crawford, J., concurring in the result). In the instant case, the victim took the stand at trial and was subject to unrestricted cross-examination by the defense. Although the military judge allowed Ann to adopt her out-of-court statement as her in-court testimony, defense counsel still had the opportunity to conduct effective cross-examination of the witness. We hold there is no confrontation issue with regard to Ann's out-of-court statements. Accordingly, the military judge did not err on either evidentiary or Constitutional grounds when he admitted the child's out-of-court statements into evidence.

## IV

### Mrs. Morgan's Statements to OSI

■ Mrs. Morgan executed two written statements to the OSI. When she refused to testify at trial, the military judge found her "unavailable" under Mil.R.Evid. 804(a)(2) and admitted both statements into evidence under the residual hearsay exception—Mil. R.Evid. 804(b)(5). Regardless whether Mrs. Morgan was "unavailable" within the mean-

---

5. When the Confrontation Clause is of concern, guarantees of trustworthiness of an out-of-court statement must be shown from only those circumstances that "surround the making of the statement and that render the declarant particu-

larly worthy of belief." *Idaho v. Wright,* 497 U.S. 805, 819, 110 S.Ct. 3139, 3148, 111 L.Ed.2d 638 (1990). In such circumstances outside corroborating evidence cannot be used to "bootstrap"

ing of the rule, we believe the military judge erred in admitting the statements.[6] However, even if Mrs. Morgan were truly "unavailable," her statements to the OSI were nevertheless inadmissible. First, much in the statements constitutes "double" or even "triple" hearsay, *i.e.*, my sister said the neighbor said that my daughter said. That is most unreliable. Second, the circumstances surrounding the making of the statement cannot be said to be supported by any "particularized guarantees of trustworthiness." *Idaho v. Wright*, 497 U.S. at 815, 110 S.Ct. at 3146; *see also United States v. Hines*, 23 MJ at 137. The wife's out-of-court declarations were inadmissible and the military judge erred by admitting them.

■ We find that the military judge's error in admitting Mrs. Morgan's statements under Mil.R.Evid. 804(b)(5) was harmless beyond any reasonable doubt. *United States v. Moreno*, 36 MJ 107, 121 (CMA 1992). Mrs. Morgan's statements to the OSI were not essential to the prosecution's case; much of the substance of her statements concerned matter that was cumulative of other evidence introduced at trial, and most importantly, the finders of fact had an opportunity to view and hear from the most critical witness, the victim herself. Accordingly, we hold that admission of Mrs. Morgan's statements in evidence under Mil.R.Evid. 804(b)(5) does not constitute reversible error.

The decision of the United States Air Force Court of Military Review is affirmed.

Judges CRAWFORD and GIERKE concur.

SULLIVAN, Chief Judge (dissenting):

I agree with the first two parts of the majority opinion. I do not agree with Part III that concerns admissibility of the victim's statement to the Office of Special Investigations. *See United States v. McGrath*, 39 MJ 158, 169 (CMA 1994) (Sullivan, C.J., dissenting). In addition, I do not agree that error in admission of Mrs. Morgan's out-of-court statement given on December 31, 1990, was harmless beyond a reasonable doubt.

Her statement on the above date reads as follows:

In late 1986 after we returned from Aviono, Italy, JAMES CURTIS MORGAN[,][A], my two sons and I moved into the Allen Bee Gardens Apartments, Forestville, MD. One day I asked [A] if anyone had ever done anything to her and told her not to tell me. [A] did not say anything at first, but then she asked me if I knew what a prostitute was. I said yes and asked her why she asked me that. [A] told me a prostitute layed down for people and she had done that for Daddy (JAMES CURTIS MORGAN). [A] told me Daddy told her not to tell anyone about what he had done with her. I asked what he had done and [A] told me he had gotten on top

the trustworthiness of the hearsay statement. *Id.* at 823, 110 S.Ct. at 3150–51.

6. A court order demanding that a witness testify is an essential requisite to a finding of unavailability under that Rule. Many federal courts are in accord with this view. *See, e.g., United States v. Zappola*, 646 F.2d 48, 54 (2d Cir.1981) ("[A]n order from the court is an essential component in a declaration of unavailability under [Federal] Rule 804(a)(2)." (Citation omitted)); *United States v. Inadi*, 748 F.2d 812, 819–20 (3d Cir. 1984) ("The government has taken, at various stages in these proceedings, several different approaches to establishing [the witness'] unavailability. It first asked the trial judge to rely on the assurances of government counsel that [the witness] was adamantly refusing to testify and was prepared to go to jail for contempt.... Such predictions by government counsel cannot be recognized as the equivalent of the actual scenar-io where a witness has appeared in court and refused to testify after a court order. Every veteran trial judge has experienced the situation where a hostile witness discards his 'stonewalling' tactics when faced with an imminent contempt citation."), rev'd on other grounds, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986). *Cf. Jennings v. Maynard*, 946 F.2d 1502, 1505 (10th Cir.1991) ("Although both the Oklahoma Code and Federal Rule 804(a)(2) normally require the court to order a witness to testify before a finding of unavailability is made, we conclude that such an order was not necessary in this case. During the in camera hearing, [the witness] testified that he would not obey a court order requiring him to testify. Further, the trial court determined that [the witness'] reason for refusing to testify—that threats ... were made against [the witness] and his family—made an order to testify inappropriate.").

of her and put his thing in her private part. *I call JAMES CURTIS MORGAN at his work with the 1776 Security Police Squadron, Andrews AFB, MD, and asked him what he had done to [A]. JAMES CURTIS MORGAN told me it happened while we were in Europe and that [A] did not tell it right. He told me [A] would come and lay down beside him. Later she started to get on top of him and ask him if he loved me (mama). Then he stated [A] got brave and began to rub him on his penis. When I asked him why he did not tell me about this, JAMES CURTIS MORGAN stated he was afraid I would leave him.* A couple of months after we moved onto base at 1165 A Hall Court, AAFB, MD, I left JAMES CURTIS MORGAN with [A] and my two sons and moved to my mother's home in North Carolina. A couple of months later, [A] told me JAMES CURTIS MORGAN had put his penis inside her while we lived in the Allen Bee Garden Apartments, Forestville, MD. Approximately 3 weeks ago, JAMES CURTIS MORGAN and I were haveing [sic] a big arguement [sic] when [A] interrupted. *During the argument JAMES CURTIS MORGAN got very quiet and apologitic [sic] when [A] stated she had something to tell me. He got so quiet I knew in my heart JAMES CURTIS MORGAN had been messing with [A].* On 28 Dec 90, I got a call from my sister, SHEILA JONES, in North Carolina who told me that [A] had called her and stated JAMES CURTIS MORGAN had raped [A]. I called the Security Police Desk and reported the incident as I could not take it anymore. When JAMES CURTIS MORGAN came to pick me up, he put the two boys in the Security Police truck with me and the security police man. He drove to the Security Police building alone and parked in the parking lot. When I saw JAMES CURTIS MORGAN I knew he had a gun although I had no way to prove it. He has told me in the past he would kill me and him if I ever left him. When I left JAMES CURTIS MORGAN and moved to North Carolina, I never intended to return to him. I was seperated [sic]

from him for approximately 2 1/2 years. I didn't report this incident to anyone because I though [sic] separation would take care of the problem.

(Emphasis added.)

Even the Government recognizes the probative value of this evidence in appellant's case. Its Answer states: "It is obvious why Appellant did not want his wife's statements admitted since they corroborate the statements of the victim, and since her 31 December 1990 statement contains Appellant's admission to sexual activity with his stepdaughter after being confronted by his wife with the victim's allegations." Answer at 21. As noted below, such a conclusion is justified by the record of trial before us.

The Government's case was based *primarily* on three out-of-court statements by a 13–year–old child-victim. The defense's theory at trial was that the victim initially made those statements because she was generally frustrated with family problems around the time she alleged rape. Furthermore, defense counsel contended that, at trial, the child was merely perpetuating these earlier lies. Thus the focus of the trial was on the victim's credibility. Evidence by a third party that corroborated the victim's statements and provided a purported admission by appellant certainly could have tipped the balance of the weight of the evidence against him. Accordingly, I find that "there is a reasonable possibility that the evidence complained of might have contributed to the conviction," and therefore the military judge's error in admitting Mrs. Morgan's statements was not harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967), *quoting Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230–31, 11 L.Ed.2d 171 (1963); *cf. United States v. Grooters,* 39 MJ 269, 273 (CMA 1994).

WISS, Judge (dissenting):

I agree with the majority opinion except for Part III and the harmless-error analysis in Part IV. As to the latter, I agree with the Chief Judge's reasoning that Mrs. Morgan's statement cannot be seen beyond reasonable

doubt to be harmless. Rather than being rather innocuous and cumulative, as the majority portrays it, I believe that the full statement as set out in the Chief Judge's separate opinion reveals it as a significant substantive addition to the corpus of the prosecution's evidence.

As to Part III, the majority considers circumstances other than those "that immediately and directly surround[ ] the making of" Ann's statement to Agent Helms of the Office of Special Investigations (OSI) to measure the statement's trustworthiness so as to qualify it as admissible under Mil.R.Evid. 803(24), Manual for Courts–Martial, United States, 1984. *See United States v. McGrath*, 39 MJ 158, 172 (CMA 1994) (Wiss, J., dissenting). Under my reading of that rule, consideration of such circumstances in the trustworthiness analysis is not permissible. *Id.*

Additionally, I believe that the majority has erred by shuffling past one of the three absolute prerequisites for admission of hearsay under Mil.R.Evid. 803(24): that "the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts...." In this regard, the majority simply opines: "*Absent the actual, spoken testimony of the child*, we believe her statement to the OSI was 'more probative' on the issue of whether the alleged rape actually occurred than would be any other evidence reasonably available to the Government." 40 MJ at 409 (emphasis added).

The difficulty is in the majority's predicate assumption: The child's testimony *was available* to the prosecution—there simply was no *absence* of her testimony. The following portion of the girl's testimony, which immediately follows a few introductory questions and answers, demonstrates that it simply was the witness' discomfort and unease which led the Government to its shortcut through the rules of evidence:

Q. Now, [Ann], you know why we're here today, don't you?

A. Yes.

Q. Why are you here?

A. For a trial.

Q. Okay, and what are we trying to find out in this trial?

A. What happened to me.

Q. Specifically you and who else?

A. And my Dad.

Q. How do you feel about testifying here today and talking about what happened with you and your stepdad?

A. I don't want to talk about it.

Q. You don't like to talk about it.

A. No.

Q. I will try to make it a little easier for you. I am going to show you a document that we have marked as Government (Prosecution) Exhibit 1, and I am going to show it to you....

Then, what follows is a series of questions—many leading—in which trial counsel obtains affirmative answers to questions whether certain events that are reflected in her pretrial statement occurred. A reading of her full statement leaves no doubt at all that, while the witness was ill at ease, her testimony at all times was there for the asking. In this context, the out-of-court statement cannot be characterized as "more probative ... than any other evidence which the proponent can procure through reasonable efforts"—it surely was not more probative than her live, in-court testimony, and that testimony was readily procurable.

In sum, I believe that Ann's pretrial statement was admitted improperly under Mil. R.Evid. 803(24) in two separate respects and that admission of her mother's out-of-court statement was not harmless error. Accordingly, I would set aside the findings and sentence and authorize a rehearing.