**UNITED STATES, Appellee**

v.

**Bryon H. KINDLE, Specialist
U.S. Army, Appellant.**

No. 95–0145.
Crim.App. No. 9302214.

U.S. Court of Appeals for
the Armed Forces.

Argued Jan. 3, 1996.

Decided Sept. 30, 1996.

For Appellant: *Captain Walter S. Weedman* (argued); *Colonel Stephen D. Smith, Lieutenant Colonel John T. Rucker, Major Roy H. Hewitt,* and *Captain Don F. Pollack* (on brief).

For Appellee: *Major Anthony P. Nicastro* (argued); *Colonel John M. Smith, Lieutenant Colonel James L. Pohl,* and *Captain Michael E. Mulligan* (on brief).

*Opinion*

CRAWFORD, Judge:

Contrary to his pleas at a general court-martial at Fort Riley, Kansas, appellant was found not guilty of unpremeditated murder but guilty of the lesser-included offense of manslaughter, in violation of Article 119, Uniform Code of Military Justice, 10 USC § 919. Appellant was sentenced by officer and enlisted members to a dishonorable discharge, 5 years' confinement, partial forfeitures, and reduction to the lowest enlisted grade. In response to a clemency petition, the convening authority reduced the forfeitures but otherwise approved the sentence. The Court of Criminal Appeals affirmed the findings and

sentence in an unpublished opinion dated November 24, 1994. We granted review on the following issue:

WHETHER THE MILITARY JUDGE ERRED BY FAILING TO ADMIT THE HEARSAY STATEMENTS OF MRS. SUTTON UNDER THE RESIDUAL HEARSAY EXCEPTION, M.R.E. 803(24), WHERE THE STATEMENTS POSSESSED THE PARTICULARIZED GUARANTEES OF TRUSTWORTHINESS AND THE ADEQUATE INDICIA OF RELIABILITY REQUIRED FOR ADMISSIBILITY.

## FACTS

After an argument in a local restaurant, appellant left in his vehicle and was followed by Mr. Miller, the victim, for approximately 6 miles when both stopped. An argument ensued and appellant shot Mr. Miller numerous times.

To support his contention that he had shot Mr. Miller in self-defense, appellant sought to introduce a statement of Mrs. Miller through Mrs. Joanna Sutton. Mrs. Sutton was the foster-care mother who had taken care of Mrs. Miller's children after the death of her husband. Mrs. Sutton alleged that Mrs. Miller, who was present at the time of the altercation, said that her husband was armed with a tire iron. Mrs. Miller denied making the statement to Mrs. Sutton. Mrs. Sutton was unclear about what exactly she heard. When Mrs. Sutton was asked for details concerning the shooting, she said, "All I know is they met at McDougals [the restaurant]." When asked what happened before the car stopped, she testified, "I guess" they [the Miller group] flashed their lights and tried to make people get off the road if they were in their way. When questioned for details about what happened when the car stopped, she testified, "I wish I would have listened to her a little more closely." She did not know how appellant and the victim were positioned or remember anything about the crowbar. She "guessed" they exchanged words but was not sure "what finally happened." She did not record or take notes about the conversation. In effect, it went "in

one ear and out the other." She was "interpreting" but not listening to what was said because she was more concerned with the care of the children and the fact that her husband was called a name by Mr. Miller. Again and again she repeated she did not know what happened or what was said. Appellant testified that the victim had a gun rather than a tire iron.

The judge made the following findings of fact:

1. Declarant, Mrs. Miller, was intoxicated during the viewing period. Her ability to accurately perceive and recount what transpired is doubtful.

2. Declarant was rambling at the time of statement to Mrs. Sutton.

3. Mrs. Sutton was not listening carefully to what Declarant was saying.

4. Mrs. Sutton readily inserted what she perceived and what she believed the Declarant saw rather than relating what the Declarant said.

5. Mrs. Sutton is biased against Declarant and sought on numerous occasions to cast the Declarant as an unfit mother.

6. Mrs. Sutton's testimony is viewed as recounting the ramblings of an alcoholic's memory of an event viewed while Declarant was intoxicated, remembered by a biased witness who readily substitutes her perceptions of what she believes the witness saw for what the witness said.

## DISCUSSION

■ Unless the judge's findings are clearly erroneous, they should be sustained. *United States v. Burris*, 21 MJ 140, 144 (CMA 1985). Our standard of review as to admissibility of Mrs. Miller's out-of-court statement is whether the judge abused his discretion. *United States v. Grant*, 42 MJ 340 (1995); *United States v. Morgan*, 40 MJ 405 (CMA 1994); *United States v. McGrath*, 39 MJ 158 (CMA 1994).

■ Pursuant to Mil.R.Evid. 103, Manual for Courts–Martial, United States (1995 ed.), the proponent has the burden of showing the "substance of the evidence." This is not necessary when the substance is "appar-

ent from the context within which questions were asked." Mil.R.Evid. 103(a)(2). In this instance, the defense, the proponent of the evidence, never established what statement was made. It was clear that Mrs. Sutton was very upset with Mrs. Miller concerning the relationship with the children, their clothing, and their care. As the judge found, Mrs. Miller "was rambling" and the witness "was not listening carefully to what" Mrs. Miller "was saying." He concluded Mrs. Sutton "readily inserted what she perceived rather than what the declarant had said."

The defense theory at trial was that appellant was acting in self-defense. Thus, the military judge did not abuse his discretion in denying the defense motion to admit Mrs. Miller's statement to Mrs. Sutton for the purpose of proving that the victim was armed with a tire iron and that Mrs. Miller incited her husband to attack appellant. But the judge did allow the statement to be used as a prior inconsistent statement to impeach Mrs. Miller's credibility when she denied the statement at trial. See Mil.R.Evid. 613. The military judge also gave limiting instructions to that effect.

In essence, the defense, except for the substantive statement itself, was able to attack and impeach Mrs. Miller through an excellent cross-examination. Thereafter, this cross-examination was effectively highlighted in argument. Accordingly, the declarant's testimony, together with the testimony of appellant effectively overcame any adverse impact from the judge's ruling that is in question here. Thus, assuming the military judge erred, we hold that the error was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The decision of the United States Army Court of Criminal Appeals is affirmed.

COX, Chief Judge (concurring):

The lesson to be learned by counsel from this case is: if you want to introduce a statement—be it hearsay, prior inconsistent, or otherwise—you must first prove what the statement is. In the instant case, the propo-

nent of the statement never established a statement.

On direct examination by defense counsel during the session under Article 39(a), Uniform Code of Military Justice, 10 USC § 839(a), Mrs. Sutton was repeatedly asked what Mrs. Miller *said.* Invariably, on matters relating to the fatal events, Mrs. Sutton testified as to what *happened,* rather than what she *heard.* Thus, when counsel asked:

Q. And then when they finally all pulled over at Scenic Drive, *what did she say happened next?*

A. I don't know if more words were exchanged. I wish I would have listened to her a little more closely, you know, because she'll talk and talk and I was listening but I wasn't. I remember her saying that a few more words were exchanged *and I don't know* if they were all out of the truck, I don't know where they were all positioned. *All I know* is that her husband [the deceased] had put the crowbar under his jacket and then started approaching Mr. Kindle. And they were saying—cursing each other out, using words. And they were all just being very ugly.

(Emphasis added.) Generally, during these questions, the witness testified with considerable specificity and forcefulness that the deceased was indeed the aggressor in this situation.

However, even during direct examination, it began to become apparent that Mrs. Sutton was often filling in huge blanks. Thus, defense counsel asked the witness:

Q. Do you recall *her [Mrs. Miller] describing* to you how it was Specialist Kindle got his gun?

A. He was on the passenger side, and he was sitting down, *and my impression was* that it was just sitting on the dash, on the top of the dash, and he grabbed the gun. *That's the impression I got over the phone.*

Q. And after he picked it up, what happened next, *according to her?*

A. They were still exchanging words and Mr. Miller [the deceased] was standing right by the passenger side door, and *I*

*guess he must have been standing up because his torso was right there.*

Q. Let me ask you a second. Are you saying passenger side or the driver's side?

A. The driver's side, excuse me, the driver's side. And Mr. Kindle shot Mr. Miller in the leg, in the thigh, in the leg, in this immediate area, *because if you are sitting down, the area you are going to see on the person is going to have to be the thigh area, the thigh or leg area.*

\*     \*     \*

Q. And then what finally happened[!]

A. *I don't know for sure. He was shot a couple of more times, that's all. . . .*

(Emphasis added.)

On cross-examination, the alleged hearsay statement began to unravel. It began with trial counsel asking the witness:

Q. You stated when talking with [defense counsel], in fact, that you wished you had listened more closely to the statement?

A. Yes.

Q. Is it fair to say that—I mean, I think your own words were that you were "listening but you were't listening."

A. Yes.

Q. Okay. Is that because [Mrs. Miller] often just rambled and you kind of just let it go in one ear and out the other?

A. Yes, [Mrs. Miller] has a habit of just rambling but it was an uncomfortable conversation. . . .

It continued with trial counsel asking:

Q. And he [appellant] was sitting down?

A. He was sitting down, *the impression I got.*

Q. And the gun was on the dashboard?

A. She said he reached out on the dash and grabbed the gun, so *I'm visualizing what she's saying.*

Q. So would it be fair to say then that a lot of this was your kind of visualizing what it was that she was telling you over the phone?

A. *A lot of it was me interpreting what she was saying to me on the phone.*

*There's only so much that I can visualize, as you would say.*

(Emphasis added.)

During court examination, the military judge, over and over, tried to get Mrs. Sutton to relate what, if anything, Mrs. Miller *said.* Over and over, however, Mrs. Sutton continued to relate what *happened.* When the military judge pointed out certain contradictory aspects of her assertions, her role as a mere reporter of a hearsay statement began to collapse. Thus, the judge observed:

Q. Now, you were talking about the events that night. You've indicated, at first when asked about the gun, you said you didn't know where the gun came from, but you had the impression that he [appellant] got it off the dash.

A. Right.

Q. Later you testified that she said that he got it off the dash. Now, which is it?

A. I'm going to have to say that—

Q. Well, you've said two different things. I'm just wondering—

A. I know.

Q. —which is it?

A. She said he reached over and pulled it off the dash. And that's what I'm going to have to stick by, because—

Q. So the first statement that you simply got the impression was an error?

A. I don't want to say it was an error.

Q. Well, it's got to be one of the two.

A. Well—

Q. You say you got the impression she said it, and I'm just asking which one it is.

A. No. No. The fact is—

Q. It's not that you've got to stick with one or the other.

A. No.

Q. I don't care what you say; just tell me the truth.

As pointed out in the dissenting opinion, the military judge made several references in his special findings concerning Mrs. Sutton's open and acknowledged bias against Mrs. Miller and the deceased, her lack of opportunity to perceive the alleged hearsay statement, her lack of personal knowledge about events, yet her eagerness to interpret the

events to make certain that the court-martial got them right, rather than merely relate statements she may have heard.

As I read this record, it was initially and primarily incumbent on the military judge to ascertain whether indeed this witness had anything at all to say that was pertinent to this court-martial. In order to know whether she was there to relate a hearsay statement, as proffered, or was really there to testify as a surrogate eye-witness, it was necessary to peal back the layers of her representations and motives. This record bears out with unusual clarity that the proponent of this so-called hearsay statement—the defense—failed utterly to distinguish between what, if anything, the witness heard, as opposed to what her overt condemnation of the deceased and Mrs. Miller led her to imagine. In this regard, it appears to me that it was absolutely necessary for the military judge to delve into the motives and basis of knowledge of this witness to determine whether, in fact, there was a hearsay statement and, if so, what it was. On this record, the military judge cannot be faulted.

Accordingly, I concur with the lead opinion.

GIERKE, Judge, with whom EVERETT, Senior Judge, joins (concurring in the result):

In my view the military judge was correct in excluding Mrs. Sutton's testimony as residual hearsay, but he was laboring under an incorrect view of the law. In short, he ruled correctly for the wrong reasons. *See Siegert v. Gilley*, 500 U.S. 226, 234–35, 111 S.Ct. 1789, 1794–95, 114 L.Ed.2d 277 (1991); *Scivally v. Time Insurance Co.*, 724 F.2d 101, 103 (10th Cir.1983). However, even if the military judge erred in excluding the testimony, I am satisfied after reviewing the entire record that any error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Accordingly, I concur in the result.

### Factual Background

The charges arose from a confrontation at a restaurant between three soldiers: appellant, Specialist Ansbach, and Specialist Holmes; and four civilians: Mr. Miller (the deceased), Mrs. Miller, Mr. Fred Place (Mrs. Miller's brother), and Mr. Douglas White. Mrs. Miller was 7 months pregnant at the time. The confrontation at the restaurant was subdued by the forcible intervention of Mr. White, but resumed after a 6-mile chase into the country on a road known as Scenic Drive. Mr. White was left behind at the restaurant, but Mr. and Mrs. Miller and Mr. Place followed appellant, Specialist Ansbach and Specialist Holmes. At a second confrontation alongside Scenic Drive, appellant shot Mr. Miller. After Mr. Miller died of his wounds, appellant was charged with unpremeditated murder, and the Miller children were placed in foster care with the Sutton family. Mrs. Sutton and Mrs. Miller talked frequently about the children. The granted issue concerns admissibility of Mrs. Sutton's testimony regarding Mrs. Miller's description of the events surrounding Mr. Miller's death.

At a session under Article 39(a), Uniform Code of Military Justice, 10 USC § 839(a), before entry of pleas, the defense asked the military judge to rule on the admissibility of Mrs. Sutton's testimony, proffered as "residual hearsay" under Mil.R.Evid. 803(24), Manual for Courts–Martial, United States (1995 ed.). At the evidentiary hearing, Mrs. Sutton testified on direct examination in pertinent part as follows:

Q. [by defense counsel]: Starting with—well, starting before that, can you tell us what she said; for example, according to her, what were they doing that night?

A. The conversation started in reference to the children. It started that if things had gone differently, she would have listened, you know, we wouldn't be on the phone right now, that the children would be home with her and everything would be just the way it was before. And then *she just said that she should have listened to what Mr. Kindle was saying about, "Stop, stop," you know, "This is enough." And basically that's all she really said.*

(Emphasis added.)

Mrs. Sutton testified that Mrs. Miller was "angry at her husband and blames herself for

making him—for being so angry—" She testified that Mrs. Miller admitted "pushing" her husband and calling him "a few bad words." Defense counsel asked the following:

Q. What bad words did she say she called him?

A. *She called him a "pussy" because he didn't do anything.* Kathy and I—we were friends—I want to say friends because we were able to talk about everything, and she uses that language very freely, it's normal for her, it's okay. And so she just kept calling him names. I guess because Mr. Miller wasn't doing anything; he wasn't pursuing the argument, so she kept telling him, "You are going to have to do something about this."

Q. And then did she tell you anything about chasing Specialist Kindle and his friends?

A. She said that they followed them up Scenic Drive and that's where they stopped.

Q. Now, has she ever told you about having chased other people before?

A. *She's mentioned that it's more of a game just to frighten people, you know, flashing the lights and just trying to get people off the road if they are in the way, if they don't drive fast enough, if someone gets on their nerves.* It's just a routine, I guess.

Q. And then when they finally all pulled over at Scenic Drive, what did she say happened next?

A. I don't know if more words were exchanged.... *I remember her saying that a few more words were exchanged* and I don't know if they were all out of the truck. I don't know where they were all positioned. All I know is that her husband had put the crowbar under his jacket and then started approaching Mr. Kindle. And they were saying—cursing each other out, using words. And they were all just being very ugly.

\* \* \*

Q. Now, do you recall for sure *whether she said crowbar or tire bar?*

A. No, I don't.

Q. Could it have been tire bar?

A. It could have been, yes.

(Emphasis added.)

On cross-examination, Mrs. Sutton was asked by trial counsel, "You don't know whether *when she told you about this* crowbar, you don't know if it was a crowbar, a tire bar, or what she said exactly?" (Emphasis added.) She responded, "No, I don't know which one it was."

The predominant theme of Mrs. Sutton's testimony about her conversation with Mrs. Miller was captured in the following:

Q. Did she tell you what Specialist Kindle was saying back to her husband?

A. The one thing Kathy does remember and *what she kept repeating to me over and over again was, "This is enough, this is going to have to stop, this is going to change the rest of our lives...."*

MJ: Wait a minute. Mr. Kindle said what?

WIT: *"This is going to have to stop. This is going to change the rest of our lives. This is enough."*

MJ: Okay.

\* \* \*

Q. Do you recall her *describing to you how it was Specialist Kindle got his gun?*

A. He was on the passenger side and he was sitting down, and my impression was that it was just sitting on the dash, on the top of the dash, and he grabbed the gun. That's the impression I got over the phone.

\* \* \*

Q. Well, what did she exactly explain to you?

A. *She said he shot Maynard in the leg.*

Q. Okay. After he shot Maynard in the leg, what was Maynard's reaction, according to her?

A. Nothing. He didn't fall down; he just stepped back a little bit and that was it.

Q. And what did Specialist Kindle say to Maynard?

A. *He said again, "This is it. We've had enough, you know, enough is enough. This is going to have to stop."* She just

*kept repeating that over, and over, and over again.*

(Emphasis added.)

Pursuing the inquiry about appellant's gun, trial counsel asked, "And the gun was on the dashboard?" Mrs. Sutton responded, *"She said he reached out on the dash and grabbed the gun,* so I'm visualizing what she's saying." (Emphasis added.) When the military judge pursued the inquiry further about the gun, Mrs. Sutton responded, *"She said* he reached over and pulled it off the dash." (Emphasis added.)

Even though Mrs. Sutton mingled her own impressions with Mrs. Miller's declarations, the record disclosed that Mrs. Sutton was testifying about the following statements by Mrs. Miller:

(1) That appellant repeatedly said, "Stop, stop. This is enough."

(2) That Mrs. Miller goaded her husband into continuing the confrontation.

(3) That Mrs. Miller and her husband chased appellant and his friends.

(4) That Mrs. Miller said her husband had a crowbar or tire iron under his jacket.

(5) That appellant took a gun from the dash of his car as Mr. Miller approached his car.

(6) That appellant shot Mr. Miller in the leg and said again, "This is it. . . . This is going to have to stop."

The military judge's "Essential Findings of Fact"[1] recite the following:

1. Declarant, Kathleen Miller, was intoxicated during the viewing period. Her ability to accurately perceive and recount what transpired is doubtful.

2. Declarant was rambling at the time of statement to Mrs. Sutton.

3. Mrs. Sutton was not listening carefully to what Declarant was saying.

4. Mrs. Sutton readily inserted what she perceived and what she believed the Declarant saw rather than relating what the Declarant said.

5. Mrs. Sutton is biased against Declarant and sought on numerous occasions to cast the Declarant as an unfit mother.

6. Mrs. Sutton's testimony is viewed as recounting the ramblings of an alcoholic's memory of an event viewed while Declarant was intoxicated, remembered by a biased witness who readily substitutes her perceptions of what she believes the witness saw for what the witness said.

7. Therefore, I find Mrs. Sutton's testimony to be an unreliable rendition of the events of 27 March 1993 and are not admitted for the truth of the matter asserted as residual hearsay.

Mrs. Miller testified for the defense on the merits. She testified that Mr. Miller was angry when they left the restaurant and began following appellant's car. She said that Mr. Miller would not tell her what the argument with appellant was about and that "it was basically none of my business." She testified that the soldier in the back seat of appellant's car was "flipping the double bird" and that made Mr. Miller even more angry. Mrs. Miller denied calling Mr. Miller a "pussy" or a "wimp", and denied encouraging him to chase appellant.

Mrs. Miller also testified that Mr. Miller carried a knife in his back pocket. She testified that Mr. Miller did not have a crowbar or tire bar with him when he got out of his truck on Scenic Drive. There were two tire tools in the truck. One was a silver four-point lug wrench "[s]haped like a cross" and the other was a dark combination jack handle and lug wrench. After Mr. Miller died, Mrs. Miller sold the truck. She removed the silver cross-shaped lug wrench because "it didn't belong with the truck."

Mrs. Miller denied hearing appellant say, "Don't do it, enough is enough. This is going to change our lives[,]" and denied telling Mrs. Sutton that she heard it. She also denied telling Mrs. Sutton that she saw appellant shoot Mr. Miller in the leg. She testified that Mr. Miller told her to stay in

---

1. Appellate review was hampered by the fact that the military judge's "essential findings of fact" were unmarked as an exhibit and were inserted in the record behind the convening authority's action, instead of in front of the authentication page, and referred to in the government brief as part of the allied papers.

the truck but that she got out, heard shots, and ducked behind appellant's car, "[a]nd from then on, I lost it."

Mrs. Sutton also testified as a defense witness.[2] Although the military judge had ruled that her testimony about Mrs. Miller's statements was inadmissible hearsay, the military judge admitted Mrs. Sutton's testimony as an inconsistent statement to impeach Mrs. Miller's testimony but not for the truth of the matters asserted.

Mrs. Sutton repeated for the members much of what she had said during the Article 39(a) session on residual hearsay. She told the members that Mrs. Miller told her that she called Mr. Miller a "pussy" and told him "[y]ou can't let them go." Mrs. Sutton testified that Mrs. Miller told her that Mr. Miller had a crowbar or tire iron "underneath his jacket." Mrs. Sutton testified that Mrs. Miller told her that appellant repeatedly said, "Enough is enough." Mrs. Sutton testified that Mrs. Miller told her that "nothing would have happened" if she had not goaded her husband.

All surviving participants in the affray testified on the merits. Specialists Ansbach and Holmes testified for the prosecution. They both testified that appellant and Mr. Miller had a confrontation at the restaurant, and that the confrontation ended when Douglas White intervened. They both testified that Mr. Miller followed them out of the restaurant parking lot in his truck. They both testified that Ansbach urged appellant to pull over when Mr. Miller began following them, but that appellant said he was "going to the country." Holmes was riding in the back seat of appellant's car but denied "flipping the double bird" at Mr. Miller and his companions.

Both Ansbach and Holmes testified that when they stopped on Scenic Drive, Fred Place got out of Mr. Miller's truck and told them to stay out of the fight between Mr. Miller and appellant. Both Ansbach and Holmes testified that they heard Mr. Miller

and appellant shouting at each other, but neither could remember what was said. Ansbach testified that he heard "two bangs" and that he saw Mr. Miller put his hands on his stomach and make what was described as a "slight movement backwards and to the right." He further testified that, after a "momentary pause," he heard three or four more shots. Holmes heard two or three shots, followed by a one-second pause, and then more shots. He did not know what Mr. Miller did after the first shots because he did not see him until the shooting stopped.

Both Ansbach and Holmes testified that they did not see a weapon in Mr. Miller's hands or on the ground at any time. Neither saw anyone remove a weapon from Mr. Miller's person, but Holmes testified that Fred Place had an opportunity to remove any weapon from Mr. Miller's jacket while he was kneeling over the fatally wounded Mr. Miller. After shooting Mr. Miller, appellant fled the scene, leaving Ansbach and Holmes behind.

Douglas White testified for the defense. He testified that one of the soldiers, wearing a blue jean jacket, made a comment about "biker trash bullshit." (Appellant testified that he was wearing a red jacket; Ansbach testified that he was wearing a jean jacket; a civilian police officer testified that Holmes was wearing a blue jean jacket.) Mr. White testified that Mr. Miller was angry and told appellant he was going to "whip his fucking ass." Mr. White broke up the altercation and had to push Mr. Miller to the ground to subdue him. As appellant drove out of the restaurant parking lot, Mr. Miller hit the driver's window of appellant's car with his hand. Mr. Miller, accompanied by Mrs. Miller and Mr. Place, then left the parking lot and "stranded" Mr. White. As appellant drove away, the passenger in the back seat was "flipping off" the Millers with "the double bird."

Fred Place testified that Mr. Miller always carried a knife, but that he did not see Mr. Miller with any weapon on the night in ques-

2. Because Mrs. Sutton was not listed in the index of witnesses and exhibits in the record of trial, her testimony on the merits apparently was overlooked by appellate counsel before the court

below. The court remarked that it was "very surprised" that neither side mentioned Mrs. Sutton's testimony. Unpub. op. at 2.

tion. Mr. Place further testified that, while he and the Millers were following appellant's car, Miller was flashing his bright lights "to signal them to pull over." Place testified that Mr. Miller's intent was to chase appellant "right onto Fort Riley, if that's what it takes to beat his ass."

Mr. Place testified that, when they pulled off the road on Scenic Drive, he told appellant's companions to stay away because "it was a one-on-one fight." He testified that appellant did not say anything before shooting Mr. Miller. According to Mr. Place, there was one shot, a pause, two shots, another pause, another shot, a pause, and a final shot. After the first shot, Mr. Miller continued to advance on appellant. Mr. Miller finally fell after the last shot.

After appellant shot Mr. Miller, Mr. Place said to appellant, "Your ass is mine." According to Mr. Place, appellant pointed the pistol at Mr. Place and said that "[h]e already shot one person and it didn't matter; he'd shoot another one."

Appellant testified on the merits. He said he always carried the pistol in the car "for protection, for self-defense." He considers "bikers" to be "not the most savory people . . . movies depict them as violent."

Appellant testified that he went to a bowling alley and consumed "[m]aybe one or one-and a half little cups of beer." Everyone else "was pretty drunk." He agreed to give Ansbach and Holmes a ride home. They decided to stop at a restaurant, where they encountered the Millers. As Mr. Miller passed their table he said to Specialist Ansbach, "How many eyes are you going to look at me with, you 8–eyed bastard?" No one responded.

Shortly thereafter, appellant encountered Mr. Miller in the bathroom. He testified that Miller asked, "What the fuck are you looking at, you fucking bastard?" Appellant "just kind of shrugged [his] shoulders and walked up to the urinal." Appellant testified that Miller "just kept going on—if I didn't get the fuck out of there, he was going to kill me and my fucking buddies." As appellant was leaving the bathroom, Miller said, "If you don't get the fuck out of here right now,

I'm going to use this thing in my jacket to kill you. I can make a phone call and have 50 guys here in 5 minutes to do it for me." Appellant testified that he responded, "Whatever, guy; how many is it going to take?" and walked out.

Appellant described Mr. Miller has having long "scraggly" hair, thick glasses, and "this crazy look in his eyes like an animal or something, demented, psycho." He was wearing a black leather jacket and dirty blue jeans.

Appellant testified that as he, Ansbach, and Holmes were leaving the restaurant, either Ansbach or Holmes said something about "leather bullshit." As appellant was entering his car, Mr. Miller ran towards him, grabbed his jacket, and said, "Here I am, motherfucker. Do something now, motherfucker."

Appellant pushed Miller away and "the big guy, Doug White" intervened. He got between appellant and Miller and grabbed appellant by the throat and told him to "[g]et in the car and just get out of here." As they were leaving, appellant heard a popping sound on the car window and saw Mr. Miller who was saying, "I'm going to fucking kill you. You are a fucking dead man."

As they drove away, Ansbach and Holmes "[s]tarted hollering out the window and flipping the guys off." Appellant told them to "shut up," but Holmes put his hands out the window and gave them "a two-handed double-bird." Mr. Miller and his companions (Mrs. Miller and Mr. Place) followed closely behind with their bright lights on. Ansbach was telling appellant to pull over and "kick these motherfuckers' ass." Appellant responded that he was not going to pull over and that he was "going out in the country." Appellant explained that he "didn't want to get stopped with these two guys in my car" because Ansbach was a minor and "[h]e was plastered." Appellant described his companions as "two drunken idiots in my car trying to start a fight." Appellant testified that he hoped Miller would stop following him, but that he finally decided to stop because a confrontation was inevitable. His car was

nearly out of gas and he "didn't want to have to face these guys after [he] ran out of gas and be stranded out there with them."

As appellant, Ansbach, and Holmes exited the car, Ansbach had his "keys in his hand with keys protruding from between his fingers," and Holmes was holding an ice scraper. Appellant testified that he suspected that Miller "had something" because, during the incident in the bathroom, Miller said that "he had this thing in his jacket he could kill me with." Appellant removed his pistol from the center console and placed it on the seat.

Fred Place approached Ansbach and Holmes and told them he was "a black-belt and he'd kill them" if they took another step. Appellant testified that Mr. Miller ran toward him saying, "Here I am, motherfucker. Do something now. I'm going to fucking kill you. I'm going to beat your ass." Appellant testified that he was scared, but he told Mr. Miller to "just get back in his truck and leave." Appellant kept telling Miller to leave but Miller refused. Appellant testified that he said, "Get back, so I can take off my jacket," but Miller responded, "You don't see me taking off my jacket, you motherfucker, because after I get done beating your ass, I'm going to use this thing inside my jacket to splatter your brains all over the road, and then I'm going to walk around the car and kill your two fucking buddies." Appellant testified that he did not know what Miller had in his jacket but thought it was a gun.

Appellant testified that he picked up the pistol from the car seat, stuck it in his waistband, and again told Miller to get in his truck and leave. Miller advanced toward him. Appellant pulled out the pistol, pointed it at him, and again told him to leave. Appellant testified that Miller called him a "fucking chicken," began to advance toward him, and said, "Come on, motherfucker, you want to do it, motherfucker." Miller continued to advance and appellant backed up, saying, "stay back from me." Miller retorted, "Shoot me, motherfucker, shoot me. You won't do it, you pussy." Appellant then shot him in the leg.

Appellant testified that Miller did not fall after being shot but "kept coming at me, acting like a crazy lunatic." Miller said, "I'll kill you for that, you son-of-a-bitch," and reached inside his jacket and pulled out a dark colored gun with a long barrel. Appellant shouted, "Don't do it," but Miller "kept reaching in and pulling it out." Appellant fired his pistol as fast as he could. He testified, "I wanted to put him down. He was trying to kill me. He was going to kill me if I didn't get him first."

Appellant stopped firing when the pistol jammed. Fred Place ran up to appellant and kicked him, saying, "Your ass is mine, motherfucker." Appellant pointed the pistol at Place and told him, "Get the fuck back. I'm not fucking kidding." Place stopped. Appellant got in his car, told Ansbach and Miller to get in the car, and when they did not, he drove away.

No pistol, crowbar, or tire iron was found on Miller's body or in the vicinity of the shooting. The police searched Mr. Miller's truck at the scene within three hours of the shooting. They found a combination jack handle and lug wrench in Miller's truck but did not seize it because it was dusty and apparently had not been touched for a long time.

### Discussion

"The residual-hearsay rule" establishes "three requirements for admissibility: (1) materiality, (2) necessity, and (3) reliability." *See United States v. Kelley,* 45 MJ 275, 280 (1996); *United States v. Pollard,* 38 MJ 41, 49 (CMA 1993). The first requirement is not at issue. The second requirement was not discussed at trial or by the court below. The military judge focused on the reliability requirement.

In my view the military judge erred by focusing on the reliability of the messenger, Mrs. Sutton, instead of the reliability of the message. The reliability requirement is met when the circumstances "that surround the making of the statement" indicate the declarant's truthfulness. *United States v. Pollard, supra,* quoting *Idaho v. Wright,* 497 U.S. 805, 819, 110 S.Ct. 3139, 3148–49, 111 L.Ed.2d 638 (1990). When confrontation is satisfied, extrinsic corroboration of the hearsay declara-

tion may be considered. *United States v. McGrath,* 39 MJ 158 (CMA 1994). However, the credibility of the witness to the hearsay declaration is not part of the equation. If there is a factual question whether the declaration was made at all, the triers of fact must resolve it. *See United States v. Welsh,* 774 F.2d 670, 672 (4th Cir.1985) ("Relevance and probativeness are closely related ... but credibility is not a component of either.").

In my view, the reliability requirement was met. Mrs. Miller's declarations to Mrs. Sutton, if they occurred, were unsolicited, spontaneous, emotional, and against her interests in regaining custody of her children. *See United States v. Grant,* 42 MJ 340, 343 (1995); *see also* Mil.R.Evid. 804(b)(3), Manual for Courts–Martial, United States (1995 ed.).

The requirement that has been ignored thus far in the appellate litigation is the necessity requirement. Mil.R.Evid. 803(24) requires that residual hearsay be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." *See United States v. Kelley,* 45 MJ at 280. Mrs. Miller testified for the defense on the merits. Her live testimony is more probative than the residual hearsay sought to be introduced through Mrs. Sutton. *See United States v. Giambra,* 33 MJ 331, 334 (CMA 1991) (victim's live testimony at trial more probative than pretrial statement); *see also Larez v. City of Los Angeles,* 946 F.2d 630, 644 (9th Cir.1991) (testimony of newspaper reporters more probative than copies of newspaper articles); *Parsons v. Honeywell,* 929 F.2d 901, 907 (2d Cir.1991) (testimony of eyewitness more probative than police officer's testimony about eyewitness' statement). All of the surviving participants testified. Of all the available evidence, the residual hearsay was the least probative. Thus, even if the military judge misapplied the reliability test, his error did not prejudice appellant because the evidence fails the necessity test and, thus, was properly excluded.

Finally, assuming *arguendo* that the military judge erred by excluding the evidence, I am satisfied that the error was harmless beyond a reasonable doubt. The overwhelming weight of the evidence established that Mr. Miller was the aggressor up to the time appellant fired the first shot. The issue at trial was whether appellant used reasonable force to defend himself. The factual disputes were (1) whether Mr. Miller had a weapon, (2) whether appellant knew or reasonably believed that Mr. Miller had a weapon, and (3) whether Miller continued to advance and threaten appellant after the first shots were fired.

Mrs. Miller's alleged declaration to Mrs. Sutton that Mr. Miller had a tire iron or crowbar in his jacket was contradicted by Mrs. Miller's live, in-court testimony. None of the witnesses except appellant said they saw a weapon. Appellant said he saw a gun, not a tire iron or crowbar. No gun, tire iron, or crowbar was found on Mr. Miller's person or in the area.

Appellant's testimony that Miller continued to advance and threaten him was supported by Mr. Place's testimony. It was contradicted by Ansbach's testimony that Miller put his hands on his stomach and moved slightly backwards. If Mrs. Miller's declaration to Mrs. Sutton had been admitted, it would have contradicted appellant's testimony. According to Mrs. Sutton, Mrs. Miller said that after the first shot, Miller "just stepped back a bit and that was it." Thus, if Mrs. Sutton's testimony about Mrs. Miller's declarations had been admitted, it would not have helped appellant and it would have contradicted him on the key issue whether Miller continued to attack after being shot.

For all the foregoing reasons, I concur in the result.

SULLIVAN, Judge (dissenting):

The majority asserts that harmless error, if any, occurred in this case. It asserts this conclusion is justified because appellant testified the alleged victim approached him with a gun. I do not understand such a rationale, since it suggests that a defendant is precluded from presenting independent corroborative evidence establishing his defense.

Here, the defense delineated the testimony of Mrs. Sutton as to the out-of-court statements of Mrs. Miller which it intended to offer to support self-defense:

1. Mrs. Sutton is the foster mother of Mrs. Miller's two sons. In the summer of 1993, she had a close relationship with Mrs. Miller. Mrs. Miller frequently confided in Mrs. Sutton and sought her advice. Mrs. Miller has testified previously that she was unable to see or hear the confrontation between her husband and SPC Kindle.

2. On one occasion, Mrs. Miller explained to Mrs. Sutton that she felt guilty about her husband's death. Mrs. Miller went on to state that she had encouraged her husband to chase and then beat SPC Kindle. She explained that her husband had tried to run SPC Kindle off the road, as he had done to other people in the past. Mrs. Miller explained that her husband had either a crow bar or a tire bar with him as he approached SPC Kindle, with the intent of seriously beating SPC Kindle.

3. Mrs. Miller then stated that she heard SPC Kindle say he did not want to fight. Her husband persisted, whereupon SPC Kindle reached into his car and withdrew a handgun. Her husband still did not desist. SPC Kindle then said again that he did not wish to fight. Mr. Miller continued to attack. SPC Kindle then shot Mr. Miller about three times.

4. These statements by Mrs. Miller to Mrs. Sutton provide material evidence of self-defense. There is no witness, other than the accused, who can describe the confrontation between Mr. Miller and SPC Kindle. Justice requires the admission of Mrs. Miller's statement to Mrs. Sutton.

That evidence corroborated appellant's testimony that the deceased, Mr. Miller, was the aggressor and that appellant was acting in self-defense. A crowbar or a tire iron in the hand of an approaching aggressor at night may well help the defense theory that appellant thought Mr. Miller had a gun. This evidence was the only corroborating evidence of this defense proffered or admitted in this case. In my view, it was both material and favorable evidence within the meaning of the Sixth Amendment. *See United States v. Valenzuela–Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982); *cf. United States v. Garcia,* 44 MJ 27 (1996). A fair trial means that both sides can put in all material, admissible evidence. Here, the jury was not allowed to hear key corroboration of appellant's defense. The evidence in this trial showed appellant killed Mr. Miller. A rehearing would show why.