UNITED STATES, Appellee

v.

Raphelito G. WELLINGTON, Sergeant
U.S. Army, Appellant

No. 02-0955

Crim. App. No. 9900782

United States Court of Appeals for the Armed Forces

Argued April 30, 2003

Decided July 7, 2003

GIERKE, J., delivered the opinion of the Court, in which
CRAWFORD, C.J., EFFRON, BAKER, and ERDMANN, JJ., joined.

<u>Counsel</u>

For Appellant:  Captain Eilin J. Chiang (argued); <u>Colonel Robert
   D. Teetsel</u>, <u>Lieutenant Colonel E. Allen Chandler, Jr.</u>, and
   <u>Major Imogene M. Jamison</u> (on brief).

For Appellee:  Captain Janine P. Felsman (argued); <u>Colonel Lauren
   B. Leeker</u>, and <u>Major Jennifer H. McGee</u> (on brief).

Military Judge:  J. P. Galligan


 **<u>This opinion is subject to editorial correction before final publication</u>**.

Judge GIERKE delivered the opinion of the Court.

Appellant was charged with raping and forcibly sodomizing his 16-year-old stepdaughter, CT, on divers occasions between November 1, 1998 and February 10, 1999, in violation of Articles 120 and 125, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 920 and 925 (2000), respectively; and committing an indecent assault on CT between February 11, 1999 and March 18, 1999, in violation of Article 134, UCMJ, 10 U.S.C. § 934 (2000). A military judge sitting as a general court-martial convicted Appellant, contrary to his pleas, of the indecent assault and the lesser-included offenses of attempted rape and attempted forcible sodomy, in violation of Article 80, UCMJ, 10 U.S.C. § 880 (2000). The adjudged and approved sentence provides for a dishonorable discharge, confinement for six years, total forfeitures, and reduction to the lowest enlisted grade. The Court of Criminal Appeals summarily affirmed the findings and sentence.

This Court granted review of the following issues:

I. WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION IN DENYING THE DEFENSE MOTION FOR A CONTINUANCE WHERE THE CONTINUANCE WAS NEEDED BECAUSE OF THE GOVERNMENT'S FAILURE TO DELIVER DISCOVERY DOCUMENTS THAT IT HAD PROMISED TO PROVIDE TO THE DEFENSE.

II. WHETHER THE MILITARY JUDGE ERRED IN ADMITTING THE STATEMENTS OF CT UNDER THE RESIDUAL HEARSAY EXCEPTION, MILITARY RULE OF EVIDENCE 807, WHEN THE STATEMENTS WERE NEITHER RELIABLE NOR NECESSARY GIVEN THE FACT THAT CT WAS FEVER-RIDDEN AND ON MULTIPLE NARCOTICS AT THE TIME SHE GAVE THE STATEMENTS AND GIVEN THE FACT THAT SHE WAS PRESENT TO TESTIFY AT TRIAL.

III. WHETHER THE STAFF JUDGE ADVOCATE'S POST-TRIAL RECOMMENDATION AND ITS ADDENDUM PREJUDICED THE APPELLANT WHEN THE CONVENING AUTHORITY CONSIDERED CLEMENCY BECAUSE THEY CONTAINED ERRONEOUS INFORMATION AS TO THE APPELLANT'S DISCIPLINARY RECORD AND HISTORY OF RESTRAINT AND FAILED TO ADDRESS LEGAL ERROR RAISED IN THE DEFENSE RULE FOR COURTS-MARTIAL 1105 MATTERS.

For the reasons set out below, we affirm so much of the decision below as affirms the findings of guilty, but we return the record for a new staff judge advocate recommendation (SJAR) and convening authority action.

## I.  Factual Background

### A.  The Offenses

The victim, CT, was diagnosed as having leukemia in 1994. She died on November 27, 1999, some four months after Appellant's trial.

CT spent significant periods of time in the hospital, and she underwent bone marrow treatment in the summer of 1998.  After being released from the hospital, she was "very debilitated," but gradually became stronger.  She suffered a relapse and was again hospitalized on February 12, 1999.  Dr. Linda Shaffer, one of CT's doctors, believed that there was no hope for CT's recovery.

On the night of March 17-18, 1999, CT began experiencing "excruciating pain" in her abdomen.  At about 4:00 a.m. on March 18, Dr. Shaffer was summoned to the hospital.  CT asked Dr. Shaffer if she was dying, and Dr. Shaffer replied in the affirmative.  At the time, CT had a fever of 103.4 degrees.  CT asked to see her mother.  Dr. Shaffer contacted the family and asked them to come to the hospital.

During a private conversation with her mother during the early morning of March 18, CT admitted that she and her aunt had molested her brother.  CT was crying and talking and then fell asleep.  CT's mother called her brother into the room.  CT awoke

3

and told her brother, "I did something bad to you," and they cried.

After her brother left the room, CT told her mother that Appellant had kissed her and touched her breasts. CT told her mother that Appellant would come into her room at night and would "put his 'private' against her 'private' and rub." While CT was talking, she "was falling asleep during a lot of it and not finishing her sentences." CT told her mother that Appellant got in bed with her in the hospital and "was rubbing on her." CT told her mother that she did not tell her about Appellant's acts because she was afraid that her mother would not love her.

CT's mother became angry and told Dr. Shaffer that she was going to kill the Appellant. Dr. Shaffer reported the threat to her supervisor, Dr. Reginald Moore, who also was one of CT's doctors.

Later that same day, Ms. Brenda Fenner, an "investigative worker" for the state of Texas, interviewed CT, accompanied by Dr. Moore, Criminal Investigative Command (CID) Special Agent (SA) Hawthorne, and CT's mother. The interview was videotaped by SA Hawthorne.

During this interview, CT told Ms. Fenner that shortly after her 16th birthday on November 7, 1998, Appellant began rubbing her legs underneath her pajamas. CT told Ms. Fenner that she did not tell her mother about the incident because she thought that her mother would not love her any more.

CT said that the family had to move out of their home because of a defective heater that was causing carbon monoxide poisoning. While they were temporarily living in a guest house,

4

Appellant came into her room at about 2:00 a.m. and got in her bed. He began kissing her and putting his tongue in her mouth. CT pretended to be asleep and Appellant stopped. "Maybe about an hour later" he began rubbing her breast and touching her buttocks and her "private part" under her clothing.

CT said that, after the family moved back into their home, Appellant came into her room at night, sucked on her breasts, pulled off her underpants, and tried to "penetrate" her. On a "couple of other nights" Appellant removed CT's underwear and rubbed his penis against her buttocks.

CT told Ms. Fenner that while her mother was in the hospital having a baby, Appellant tried to have sex with her in her mother's bed. At that point in the interview, CT began crying uncontrollably and said, "I don't want to talk anymore right now." The interview was terminated.

On the next day, March 19, Dr. Shaffer was conducting a gynecological exam of CT in an effort to determine the sources of her multiple infections. Dr. Shaffer explained to CT that the exam was necessary to determine if she had an infection that had not been treated. Dr. Shaffer testified that after this explanation, CT spontaneously said, "after 'he' was done, she would go to the bathroom to get all the 'yuckie stuff' out, and that when she wiped there would be blood on her tissue, and it would hurt really bad when she [urinated]."

Dr. Shaffer testified that CT was mentally "normal" when she made the spontaneous statement. CT knew who Dr. Shaffer was, where she was, and what they were talking about. CT had been

"very involved" in making choices of narcotics and medical procedures, and she was mentally alert.

On March 26, Ms. Fenner, accompanied by Dr. Moore, Dr. Shaffer, and SA Hawthorne, conducted a second videotaped interview. In this interview, CT said that at least one of the incidents occurred while she was in the hospital. Appellant had agreed to watch CT overnight, and sometime during the night, he got in the hospital bed with CT and rubbed her vagina, buttocks, and breasts. When SA Hawthorne asked CT if Appellant actually touched her with his penis, CT said that she was lying on her back and "He tried to go in." CT told him "stop, it hurts." On another occasion, she was on her stomach and he tried to "get in" her anus. She was "scooting" away from Appellant but could not get away. CT said, "And if I moved anywhere, it would go, it would – it – the penis would go in, or something --." At this point in the interview, CT began crying and the interview was terminated.

Although CT's mother testified that CT "was definitely not 'with it'" during the period from March 17-31, CT's mother found CT's accusations sufficiently credible to cause her to threaten to kill Appellant. Dr. Moore and Dr. Shaffer testified that CT was properly oriented and "very coherent" during the videotaped interviews, and they opined that she was not experiencing "any hallucination, disorientation, confusion, or anything of that nature."

Appellant was interviewed by agents of the CID on March 18 and 19. He provided a sworn written statement in which he

6

admitted that he had kissed and fondled CT, and rubbed his penis against her. He denied any sexual penetration.

### B. Request for Continuance

On June 21, four days after the referral of charges, the defense requested CT's medical records. On July 17, the prosecution responded that many of the documents were available for review at various agencies at or in the vicinity of Fort Sam Houston, Texas. On July 23, the defense asked for copies of the records. The prosecution promised to copy the records and send them to defense counsel by overnight Federal Express; however, the records were never sent.

On July 28, the defense filed a written motion to dismiss the charges with prejudice for lack of speedy trial in violation of Rule for Courts-Martial 707 [hereinafter R.C.M.], Articles 10 and 33, UCMJ, 10 U.S.C. §§ 810, 833 (2000) and the Sixth Amendment.

When the defense counsel arrived at Fort Sam Houston on August 3, the day before trial, he was offered the opportunity to view and copy the requested documents, "a nearly 12-inch stack of mostly double sided medical records." On the same day, the defense counsel filed a written motion for a two-week continuance, citing the Government's failure to send the medical records as promised. The defense argued that the medical records were essential to the defense "because they pertain to [CT's] physical and mental condition, as well as medications received by her, at the time of the statements which the Government is attempting to introduce."

The prosecution opposed both motions, but conceded that the records were not provided to the defense until noon on August 3. At a pretrial hearing on the afternoon of August 4, defense counsel argued that he needed CT's medical records to show "medications, indications of her mental status, [and] the times that she was hallucinating." The military judge noted that CT's doctors had testified at the hearing pursuant to Article 32, UCMJ, 10 U.S.C. § 832 (2000), and that the defense had interviewed them. The military judge asked defense counsel, "[D]o you have any reason to believe that the doctors haven't told you forthrightly, exactly, what types of medication she has been taking?" Defense counsel responded:

> Actually, your Honor, I have very good reason to believe that the doctors are reluctant to say anything that may be seen as favorable to the defense. So, therefore, I believe it will be necessary to confront them with their own medical records in order to do that effectively.

After ascertaining that the defense adhered to its earlier motion to dismiss for lack of speedy trial, the military judge denied the request for a continuance. The military judge then stated:

> I will permit the defense, however, broad latitude in any cross-examination of the physicians on the matters associated with the types of drugs that the victim has been taking, and any type of pharmacological [effect] that those might have on an individual, to the extent that it would be [sic] appear relevant.
>
> . . . .
>
> . . . And again, if you need additional time, if time is required for you to be able to sit down and go over some of these in greater detail with the doctor, bring that to the court's attention. But to the extent, that it is the only basis of the defense's request for continuance – motion for continuance by the defense is denied.

Finally, the military judge explained that it was important to proceed with the trial as originally docketed in light of Appellant's "continuing demand for a speedy trial" and "the very unique tenuous medical condition of the victim."

## C.  Residual Hearsay

CT testified at Appellant's court-martial.  She testified that Appellant had "French kissed" her, rubbed her breasts and legs, and rubbed his penis between her legs near her vagina.  She described the incidents as "fooling around."  She also testified that Appellant rubbed his finger on her vagina.

CT testified that she had no recollection of saying that Appellant touched her buttocks with his penis.  She did not remember making any statements to Dr. Moore or Ms. Fenner.  She testified that she remembered nothing that happened in the hospital in late March because she "was under a lot of medication."

She testified that she loved Appellant but believed that he had to be punished because he did something wrong.  Finally, she testified that she did not report Appellant's sexual abuse to her mother because she was afraid that her mother would not love her any more.

The prosecution offered four statements under Military Rule of Evidence 807 [hereinafter M.R.E.], the residual hearsay exception: (1) CT's statements to her mother on March 18; (2) the videotaped interview on March 18; (3) CT's spontaneous statement to Dr. Shaffer during the gynecological examination on March 19; and (4) the videotaped interview on March 26.  The defense

objected, asserting that the statements were unreliable because at the time CT made them she was under the influence of multiple drugs, hallucinating, in and out of consciousness, and running a high fever.  The defense also pointed out that none of the statements were under oath.  The military judge admitted the four statements.  He left open the possibility that further detailed findings would be appended to the record if necessary, but no further findings were appended.

### D. The SJAR

The SJAR stated that Appellant received nonjudicial punishment under Article 15, UCMJ, 10 U.S.C. § 815 (2000) on two occasions.  The SJAR recited the following:

> Prior Art. 15s: Field Grade Article 15 for underage drinking, assault consummated by battery, and drunk and disorderly at Travis Air Force Base.  Punishment imposed on 24 Jul 98.  Field Grade Article 15 for failure to obey lawful order.  Punishment imposed on 14 Dec 98.

The Government concedes that this entry is incorrect, and that Appellant did not receive nonjudicial punishment at any time during his career.

The SJAR also advised the convening authority that Appellant was not subjected to any pretrial restraint.  This entry was incorrect because Appellant was restricted.  In fact, during the trial Appellant contended that the restriction was so onerous that it was tantamount to confinement.

Based on the recommendation of the military judge, the staff judge advocate (SJA) advised the convening authority to suspend the adjudged total forfeitures.  She advised that

total forfeitures could be suspended "for a maximum period of two years" under Army regulations and R.C.M. 1108. In his clemency petition, Appellant asked the convening authority to "suspend his forfeitures, both adjudged and automatic, to the fullest extent permitted by law."

In his post-trial submission to the convening authority under R.C.M. 1105 he repeated his assertion that his restriction was tantamount to confinement, but he did not point out that the SJAR was incorrect. The SJA submitted an addendum, but no corrections were noted in the addendum.

## II. Discussion

### A. Continuance

Article 40, UCMJ, 10 U.S.C. § 840 (2000) empowers military judges, to "for reasonable cause, grant a continuance to any party for such time, and as often, as may appear to be just." "Reasonable cause" includes insufficient opportunity to prepare for trial. See R.C.M. 906(b)(1) discussion. In Morris v. Slappy, 461 U.S. 1, 11 (1983), the Supreme Court recognized that "broad discretion must be granted trial courts on matters of continuances." Accordingly, the Supreme Court adopted a very deferential standard of review, stating that "only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'" will result in reversal. Id. at 11-12; See also United States v. Weisbeck, 50 M.J. 461, 464 (C.A.A.F. 1999)(abuse of discretion to deny continuance to obtain expert witness). On the other hand, possible loss of witnesses is a valid consideration in

deciding whether to deny a continuance. See United States v. Royster, 42 M.J. 488, 490-91 (C.A.A.F. 1995)(no abuse of discretion to deny continuance to prevent possible loss of witnesses).

In this case, we need not decide if the military judge abused his discretion, because Appellant has not established that he was prejudiced. His counsel cross-examined Dr. Shaffer and Dr. Moore about CT's medications, the effect of her medications on her mental status, and the incidents of hallucination. To this day, Appellant has not shown what he would have done differently at his trial if the Government had responded to the request for discovery in a timely manner.

## B. Residual Hearsay

The military judge admitted CT's statement to her mother, the two videotaped interviews conducted by Ms. Fenner, and CT's statement to Dr. Shaffer as residual hearsay under M.R.E. 807. The rule provides:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of truthworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

The residual-hearsay exception is "intended to apply [only] to highly reliable and necessary evidence." United

States v. Giambra, 33 M.J. 331, 334 (C.M.A. 1991)(citing S.
Saltzburg, et al., Military Rules of Evidence Manual 659
(2 ed. 1986). A military judge's decision to admit residual
hearsay is entitled to "considerable discretion" on
appellate review. United States v. Pollard, 38 M.J. 41, 49
(C.M.A. 1993). Where, as in this case, the declarant
testifies and the Sixth Amendment's Confrontation Clause is
satisfied, reliability of the residual-hearsay evidence may
be established by the circumstances that immediately and
directly surround the making of the declaration as well as
corroboration by other evidence extrinsic to the
declaration. United States v. Morgan, 40 M.J. 405, 409
(C.M.A. 1994); United States v. McGrath, 39 M.J. 158, 167
(C.M.A. 1994).

The necessity prong "essentially creates a 'best
evidence' requirement." United States v. Kelley, 45 M.J.
275, 280 (C.A.A.F. 1996)(citing Larez v. City of Los
Angeles, 946 F.2d 630, 644 (9th Cir. 1991)). This prong may
be satisfied where a witness cannot remember or refuses to
testify about a material fact and there is no other more
probative evidence of that fact. See United States v.
Owens, 484 U.S. 554 (1988)(witness could not remember
identifying his attacker because of memory loss caused by
injuries suffered in the attack); United States v.
Martindale, 30 M.J. 172 (C.M.A. 1990), aff'd after remand by
40 M.J. 348 (C.M.A. 1994)(learning-disabled minor victim
unable or unwilling to testify).

In this case, there is no dispute about the materiality of the evidence.  Appellant contends, however, the evidence was not reliable because CT was under the influence of drugs and possibly hallucinating.  Appellant also contends that the evidence was not necessary because CT testified.  The military judge determined that the four statements were reliable, having "circumstantial guarantees of truthworthiness" equivalent to M.R.E.s 803 and 804.  For the following reasons, we hold that the military judge did not abuse his discretion by admitting the four statements as residual hearsay.

With regard to CT's statements to her mother on March 18, the military judge noted that: (1) the statements occurred shortly after Dr. Shaffer told CT that she was dying; (2) they were similar to a dying declaration under M.R.E. 804(b)(2); and (3) they were made to her mother, for whom she professed deep love, in a non-coercive, private setting.  The record also reflects that CT preceded her accusations against Appellant with a confession to her mother that she had abused her brother.  See M.R.E. 804(b)(3)(statements against interest).

By viewing the videotapes, the military judge was able to observe CT's demeanor, evaluate the questioning techniques, observe the physical surroundings, and evaluate CT's clarity of thought at the time she made the statements. Regarding the first videotaped interview on March 18, the military judge considered that it took place in the same non-coercive environment on the same day as CT's

14

conversation with her mother; (2) it occurred shortly after CT was informed that she was dying; (3) CT's mother was present during the interview; and (4) Dr. Shaffer, whom she trusted, also was present. With respect to the the second videotaped interview on March 26, the military judge noted that it took place under conditions similar to the first videotaped interview, with Dr. Shaffer and Dr. Moore present. See United States v. Ureta, 44 M.J. 290, 297 (C.A.A.F. 1996)(potentially coercive atmosphere attenuated by presence of mother and trusted friend). According to Dr. Shaffer and Dr. Moore, CT was mentally alert, coherent, and not hallucinating during the videotaped interviews. See Idaho v. Wright, 497 U.S. 805, 821 (1990)(listing mental state as a factor).

Regarding CT's statement to Dr. Shaffer on March 19, the military judge considered that: (1) it was spontaneous (see id. (listing spontaneity as factor)); (2) made during a gynecological examination, immediately after Dr. Shaffer told CT that she was looking for sources of infection; and (3) similar to a statement made for purposes of medical diagnosis under M.R.E. 803(4).

Finally, the military judge considered several additional factors in determining that all four statements were reliable: (1) their proximity in time to the events described; (2) their internal consistency; (3) their consistency with each other; (4) CT's apparent intelligence and use of terminology appropriate to her age; (5) CT's lack of bias or motivation to lie; and (6) the absence of

evidence of efforts to cause her to fabricate, lie, or embellish.  See Wright, 497 U.S. at 821 (listing appropriate terminology and consistent repetition as factors); see also Pollard, 38 M.J. at 49.

The military judge took into account that none of the statements were sworn, although he did not expressly address the defense assertion that CT's declarations were unreliable because she was heavily medicated and hallucinating, he had before him the uncontroverted testimony of Dr. Moore and Dr. Shaffer that CT was "very coherent" and was not experiencing "any hallucination, disorientation, confusion, or anything of that nature" before or during the videotaped interviews. In addition, he was able to view the videotape and make his own independent evaluation of her mental condition.  He concluded that the totality of the circumstances provided the requisite indicia of reliability.  Based on the evidence of record, we hold that the military judge did not abuse his discretion by determining that the four statements met the reliability prong of M.R.E. 807.

We turn next to the question whether the statements were necessary.  CT's trial testimony corroborated Appellant's confession to various indecent acts, but she consistently testified that she could not remember the sexual assaults in the hospital and could not remember telling her mother, Dr. Shaffer, or Dr. Moore about Appellant's sexual abuse.  CT attributed her lack of memory to the massive medication she received during a period when her doctors believed that her death was imminent.  CT's four

16

statements were the only evidence supporting the charges of rape and forcible sodomy and the only evidence corroborating Appellant's confession to committing indecent acts. See Kelley, 45 M.J. at 281 (need for corroboration made residual hearsay necessary). The videotape was the best evidence available to the military judge to evaluate the clarity of CT's thought processes during the two videotaped interviews and to resolve the issues raised by the defense regarding her mental condition. Thus, we hold that the military judge did not abuse his discretion when he determined that the residual hearsay was necessary.

### C.  The SJAR

Article 60(d), UCMJ, 10 U.S.C. § 860(d) (2000), requires the convening authority to "obtain and consider the written recommendation of his staff judge advocate or legal officer." Consistent with this Congressional intent, the President has acknowledged that "[t]he purpose of the recommendation . . . is to assist the convening authority to decide what action to take on the sentence in the exercise of command prerogative." R.C.M. 1106(d)(1). In United States v. Mark, 47 M.J. 99, 101 (C.A.A.F. 1997), this Court stated:

> The importance of the SJA's recommendation with respect to a convening authority's action is long established. See e.g., United States v. Leal, 44 M.J. 235 (1996); United States v. Norment, 34 M.J. 224 (CMA 1992); United States v. Narine, 14 M.J. 55 (CMA 1982); United States v. Goode, 1 M.J. 3 (CMA 1975). Although its scope has been narrowed, the significance of the SJA's recommendation and its contents has actually increased. This has occurred because the convening authority is no longer required to personally review the record of trial before taking action. See United States v. Diaz,

17

> 40 M.J. 335, 340 (CMA 1994)(explaining 1993 amendments to the Code related to the convening authority's post-trial responsibilities).

Where, as in this case, the SJAR is served on the defense counsel and accused in accordance with R.C.M. 1106(f)(1), and the defense fails to comment on any matter in the recommendation, R.C.M. 1106(f)(6) provides that any error is waived unless it rises to the level of plain error.

R.C.M. 1106(d)(3)(C) and (D) require that the SJAR contain a summary of "any records of nonjudicial punishment: and "[a] statement of the nature and duration of any pretrial restraint."  The Government concedes the SJAR misstates Appellant's disciplinary record and omits mention of the pretrial restraint imposed.  We test for plain error, because Appellant did not comment on these errors.[*]  See generally United States v. Powell, 49 M.J. 460 (C.A.A.F. 1998).  In our view, the errors are "clear" and "obvious." Id.  The only question is whether the errors resulted in material prejudice to Appellant's substantial right to have a request for clemency judged on the basis of an accurate record.

---

[*] In response to Appellant's request for relief from the adjudged total forfeitures, the SJA advised the convening authority that he was authorized to suspend the forfeitures "for a maximum period of two years as per AR [Army Regulation] 27-10, para. 5-31 and Rule for Courts-Martial 1108."  This advice also appears to be incorrect, because the version of the Army Regulation in effect at the time of the convening authority's action, as well as the current version (at paragraph 5-34), authorize suspension for a maximum period of two years or the period of any unexecuted portion of confinement, whichever is longer.  (Emphasis added.)

In this case Appellant had no disciplinary record prior to his court-martial, but the SJAR portrayed him as a mediocre soldier who had twice received punishment from a field grade officer. According to the erroneous SJAR, the first punishment was for underage drinking, drunk and disorderly conduct, assault and battery; the second punishment was for disobedience. Appellant's "best hope for sentence relief" was dashed by the inaccurate portrayal of his service record. See United States v. Jones, 36 M.J. 438, 439 (C.M.A. 1993). Accordingly, we hold that there was plain error in the SJAR, and we will not speculate on what the convening authority would have done if he had been presented with an accurate record. Id.

## III. Decision

The decision of the United States Army Court of Criminal Appeals is affirmed with respect to findings and reversed as to sentence. The record is returned to the Judge Advocate General of the Army for remand to a convening authority for a new staff judge advocate's review and convening authority's action. Thereafter, Articles 66 and 67, UCMJ, 10 U.S.C. § 866, 867 (2000), will apply.