# UNITED STATES NAVY–MARINE CORPS
# COURT OF CRIMINAL APPEALS

———————————

## No. 201600299

———————————

### UNITED STATES OF AMERICA
Appellee

v.

### KABRIEL K. JACKSON
Lance Corporal (E-3), United States Marine Corps
Appellant

———————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Colonel James K. Carberry, USMC.
Convening Authority: Commanding General, 3d Marine Aircraft
Wing, Marine Corps Air Station Miramar, San Diego, CA.
Staff Judge Advocate's Recommendation: Major John A. Cacioppo,
USMC.
For Appellant: Lieutenant Commander Jeremy J. Wall, JAGC, USN.
For Appellee: Lieutenant Commander Justin C. Henderson, JAGC,
USN; Major Cory A. Carver, USMC.

———————————

Decided 19 December 2017

———————————

Before HUTCHISON, FULTON, and SAYEGH, *Appellate Military Judges*

———————————

**This opinion does not serve as binding precedent, but may be cited
as persuasive authority under NMCCA Rule of Practice and
Procedure 18.2.**

———————————

SAYEGH, Judge:

At a contested general court-martial, a military judge convicted the
appellant of one specification of maiming his four-year-old step-daughter by
burning her legs and feet with hot water; one specification of aggravated
assault for the same act; and one specification of child endangerment for
failing to seek medical care, in violation of Articles 124, 128, and 134,
Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 924, 928, and 934.

Following findings, the military judge (MJ) conditionally dismissed the Article 128, UCMJ, charge pending appellate review as multiplicious for the purpose of sentencing. The MJ sentenced the appellant to reduction to pay grade E-1, forfeiture of all pay and allowances, confinement for 30 months, and a bad-conduct discharge. The convening authority approved the sentence as adjudged and, except for the bad-conduct discharge, ordered it executed.

The appellant raises three assignments of error (AOEs): (1) the MJ erred by admitting a video of the forensic interview of the child-victim in violation of the Confrontation Clause of the Sixth Amendment; (2) the convictions for maiming and child endangerment are factually insufficient; and (3) the charge of aggravated assault is unconstitutionally vague as applied to him.

After careful consideration of the record of trial and the parties' pleadings, we are satisfied that the findings and sentence are correct in law and fact, and that no error materially prejudicial to the substantial rights of the appellant occurred. Arts. 59(a) and 66(c), UCMJ.[1]

## I. BACKGROUND

On 12 August 2015, the appellant was home alone with his four-year-old step-daughter, AH, aboard Marine Corps Air Station, Yuma, Arizona. The appellant's wife was a drilling military reservist and had departed the area a few days earlier for her drill period in San Diego, California. At approximately 1630, Lance Corporal (LCpl) TW arrived at the appellant's home to assist him in caring for AH. LCpl TW testified that when he arrived at the appellant's home the appellant was "crying very hard" and when asked "what happened?" the appellant replied, "I don't know."[2] The appellant directed LCpl TW upstairs where he found AH on the floor under a blanket, shaking, with a fan positioned to blow cool air on her feet, both of which appeared to have been burnt.[3] LCpl TW observed the skin on AH's feet to be blistered up to her ankles and that "it literally looked like if you touched [her skin], you could slide it off."[4] AH was shivering on the floor, but alert, not crying, and able to respond that she was "a big girl" and wanted to go to sleep.[5] LCpl TW testified that the appellant told him that he had tried to pop

---

[1] Having found the evidence factually sufficient to support the appellant's convictions for maiming and child endangerment, the military judge's dismissal of the finding of guilt under Article 128, UCMJ, for aggravated assault remains. We therefore need not address AOE (3) which pertains to the conditionally dismissed specification.

[2] Record at 97.

[3] *Id.*

[4] *Id.*

[5] *Id.*

the blisters on AH's feet with a pin and that he had applied hand powder to the affected area.[6] LCpl TW also testified that the appellant claimed that, "he scooped her out of the tub and he was like–I guess, she was gone so he did CPR and she came to after a while."[7]

LCpl TW's immediate reaction was to instruct the appellant to take AH to the emergency room. The appellant indicated he needed to contact his wife first. LCpl TW overheard the appellant's wife instruct him not to seek medical treatment for AH because he would get in "trouble."[8] The appellant's wife contacted her mother, who, in turn, called the appellant and concurred with the appellant's wife.[9] After speaking with his wife and mother-in-law, the appellant decided against taking AH to the emergency room, and, instead, opted to treat her with over-the-counter first-aid supplies, which LCpl TW went to the local exchange and purchased.[10]

Upon returning with burn ointment and bandages, LCpl TW overheard the appellant still talking to his wife. Hearing that the appellant was going to drive AH to her mother in San Diego for medical treatment, LCpl TW decided it was time to call his command.[11] Command representatives immediately went to the appellant's home. Staff Sergeant (SSgt) JB testified that upon seeing AH's feet, he immediately determined her burns "were substantial and needed medical attention."[12] SSgt JB observed AH to have tears in her eyes but not crying; "she seemed scared but calm."[13] SSgt JB then coordinated the transportation of the appellant and AH to the local hospital.[14] Within an hour of being evaluated by emergency room doctors in Yuma, AH was processed for a medivac flight to a burn center in Phoenix.

At the burn center, AH's burns were treated with medication, debridement of the burned tissue, and skin grafts. The injuries suffered by AH included "deep second to third-degree burns of her feet" and second-

---

[6] *Id*. at 101.

[7] *Id*. at 102.

[8] *Id*. at 98-99. LCpl TW was aware that the appellant had been reported to local child services a week prior for leaving AH unattended at his home. *Id*. at 90.

[9] At one point during the phone conversations, the appellant's wife directed the appellant to claim LCpl TW was with him when AH was burned. The appellant told his wife he would not do that.

[10] *Id*. at 98-99

[11] *Id*. at 100.

[12] *Id*. at 89

[13] *Id*.

[14] *Id*. at 89-90.

degree burns on her buttocks.[15] Her bandages had to be changed frequently. On one occasion, while a nurse was cleaning and inspecting AH's wounds, AH made the unprompted remarks "My daddy did that to me," followed by "daddy burned my feet."[16]

On 2 September 2015, AH participated in a video-taped forensic interview coordinated by the Maricopa County Attorney's Office. During the interview, AH again stated "Daddy burned my feet," and added that the appellant "told me to do something and I didn't do it."[17] She further detailed how the appellant told her, "When Daddy tells you to do something, you do it."[18] AH recalled that the appellant "whupped my butt," and that she was "[standing] in the tub again and it was hot water" while the appellant was "in the bathroom with me."[19] AH told the interviewer that the appellant was mad at her and had "whupped"[20] her at the time she was burned. Finally, AH indicated it was the appellant who turned on the hot water while she was standing in the tub.

At trial, the government called AH to testify, but she was unable to recall most of the pertinent facts she had relayed to the forensic examiner. AH was unable to recall why the appellant was angry, whether the appellant had "whupped" her before putting her in the tub, or what she was doing when her feet were burned. The appellant's civilian defense counsel (CDC) cross-examined AH but was similarly unsuccessful in eliciting significant details. Following direct examination, cross-examination, and re-direct examination, the defense indicated they had no further questions of AH.[21]

The trial counsel moved to have the video of AH's forensic interview admitted into evidence as residual hearsay under MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 807, MANUAL FOR COURTS-MARTIAL, UNITED

---

[15] *Id.* at 181-82.

[16] *Id.* at 128.

[17] Prosecution Exhibit 7.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] Record at 153. The record reflects the following exchange:

"[CDC]: Your honor, we have no further questions at this time.

[MJ]: You sure? I'm patient.

[CDC]: Yeah, I think we're –

[MJ]: You're good. Ok."

STATES (2016 ed.). The MJ ruled the video was admissible as residual hearsay.

In addition to AH and the video of her forensic interview, the government presented the testimony of the physicians who treated AH, one initially in Yuma, and the other later at the burn center in Phoenix. Neither of the treating physicians would offer an opinion regarding whether or not AH was burned intentionally. However, the staff emergency physician from Yuma described AH as having a "scald burn"[22] and the surgeon from Phoenix testified her injuries were consistent with immersion in hot water.[23] The government also presented medical testimony that AH had no medical conditions or defects that would have prevented her from getting out of a bathtub if she felt the water was too hot.[24]

The defense theory was that after the appellant placed AH in the tub and ran the water and then left her unattended as he went to make her dinner. Unattended, AH increased the volume of hot water and inadvertently caused the burns to her feet by remaining in the tub too long with the hot water running. The defense argued that the appellant never intended to burn her and that when he heard AH scream, he immediately went to her aid and found her passed out, slumped over the side of the tub, with her feet dangling in the water.[25]

The defense presented the testimony of AH's mother and Dr. Portenza, who is a professor of surgery, and the director of the burn center, at the University of California, San Diego. AH's mother testified that AH knew she was not supposed to get out of the tub on her own and that AH would sometimes turn up the hot water.[26] AH's mother also testified that on a couple of occasions AH told her the incident was an "accident."[27] On cross-examination, AH's mother agreed that AH could physically get out of the tub on her own, and when the water got too hot, AH would verbally say so.[28] Dr. Potenza testified that his assessment of the burns on AH's feet, ankles, and buttocks suggested she was initially sitting in the tub and then stood up

---

[22] *Id.* at 178.

[23] *Id.* at 184.

[24] *Id.* at 217. LCpl TW also testified that when he babysat for AH, she would, on occasion, climb out of the tub on her own. *Id.* at 96.

[25] *Id.* at 278-79.

[26] *Id.* at 223.

[27] *Id.* at 226.

[28] *Id.* at 232.

when the water got hot.[29] On cross-examination, Dr. Potenza agreed his testimony meant that AH sat in the tub until she suffered second degree burns on her buttocks, at which point she stood up and remained in the tub long enough to suffer the third degree burns on her feet.[30] The doctor acknowledged that AH would be in pain while getting burned from the hot water, but he also noted that children do not always get out of the tub when the water is burning them.[31]

## II. DISCUSSION

### A. Confrontation Clause

The appellant argues that the MJ's decision to admit the forensic video of AH violated the appellant's Sixth Amendment right to confrontation because the video was testimonial hearsay and AH was not "available" to be effectively cross-examined, as required by the Supreme Court's holding in *Crawford v. Washington*, 541 U.S. 36 (2004).

"The Confrontation Clause bars the admission of testimonial statements of a witness who did not appear at trial unless the witness was unavailable to testify and the defendant had a prior opportunity for cross examination." *United States v. Gardinier*, 65 M.J. 60, 64 (C.A.A.F. 2007) (citing *Crawford*, 541 U.S. at 53-54.) But "'when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraint at all on the use of his prior testimonial statements.'" *United States v. Rhodes*, 61 M.J. 445, 450 (C.A.A.F. 2005) (quoting *Crawford*, 541 U.S. at 59 n.9).

The appellant asserts that "available" under the Sixth Amendment's Confrontation Clause requires the declarant to be "meaningfully available to be cross-examined."[32] We disagree.

"[T]he Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Kentucky* v. *Stincer*, 482 U.S. 730, 739 (1987) (quoting *Delaware* v. *Fensterer*, 474 U.S. 15, 20 (1985)). There is no requirement that a declarant who appears for cross-examination be able to defend or explain his or her prior statements. *Rhodes*, 61 M.J at 450. More importantly, an MJ can find a declarant to have been "subject to cross examination concerning the [prior] statement" despite an assertion of

---

[29] *Id.* at 244.

[30] *Id.* at 254.

[31] *Id.* at 255-61

[32] Appellant's Reply Brief of 17 Mar 2017 at 4. At trial, the appellant's defense characterized AH's testimony at trial as "thorough." Record at 159.

memory loss on the witness stand. *United States v. Owens*, 484 U.S. 554, 561-62 (1988).

The appellant relies on the language of footnote 9 of *Crawford*, which he argues suggests a declarant must be "present at trial to defend or explain [his prior testimonial statements]."[33] Such reliance is misplaced. We find nothing in this language to suggest a declarant must be able to defend or explain her previous statements. The footnote only reiterates that a declarant's presence at trial must be for the purpose of testifying under oath and being subjected to cross-examination. Here, the appellant's defense counsel was provided unrestricted opportunity to cross-examine a competent AH following her testimony as a government witness and was also permitted to recall her to the stand following the MJ's decision to admit the forensic interview video as evidence.[34] This satisfies the confrontation requirement of *Crawford*.[35]

The appellant also challenges, on appeal, the MJ's ruling admitting the forensic interview under the MIL. R. EVID. 807 residual hearsay exception.[36] The appellant asserts: if AH was available for purposes of confrontation, the government failed to establish the necessity of the forensic interview as residual hearsay.[37] "A military judge's decision to admit residual hearsay is entitled to 'considerable discretion' on appellate review." *United States v. Wellington*, 58 M.J. 420, 425 (C.A.A.F. 2003) (citing *United States v. Pollard*, 38 M.J. 41, 49 (C.M.A. 1993)).

The MJ found the video to be material in providing important evidence related to motive and the appellant's presence in the bathroom with AH at the time of her injuries. The MJ properly found necessity by applying a "best

---

[33] Appellant's Reply Brief at 4.

[34] Record at 172. The defense rested without recalling AH to testify.

[35] The MJ could have determined AH to be unavailable, despite her presence at trial, if she was found to be incompetent based on her young age, or based on her inability to remember. *Gardinier*, 63 M.J. at 540 (citing *California v. Green*, 399 U.S. 149, 167-68 (1970)). The MJ exercised his discretion in determining AH was competent to be a witness and that she intended to tell the truth. *See United States v. Morgan*, 31 M.J. 43, 48 (C.M.A. 1990) (Military judge found a four-year old competent despite her affirmative responses were predominantly by nods of her head rather than verbal responses.).

[36] MIL. R. EVID. 807 provides in pertinent part that under the following circumstances a hearsay statement is not excluded by the rule against hearsay: (1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative than any other evidence that the proponent can obtain through reasonable efforts; and admitting it will best serve the interests of justice.

[37] Appellant's Reply Brief at 9.

evidence" analysis that AH's statements during the forensic interview were more detailed and specific than her testimony at trial.[38] We note that the necessity prong may be satisfied where a witness cannot remember material facts and there is no other more probative evidence of those facts. *Wellington*, 58 M.J. at 425 (citing *Owens*, 484 U.S. at 554). Finally, the MJ properly found reliability in the statements AH made to an experienced child forensic interviewer, who used open-ended questions with a four-year-old witness who had no known motive to fabricate.[39]

## B. Factual sufficiency

The appellant challenges the factual sufficiency of his convictions for maiming under Article 124, UCMJ, and child endangerment under Article 134, UCMJ. We review questions of factual sufficiency *de novo*. Art. 66, UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is whether, "after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006) (citing *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987) and Art. 66(c), UCMJ), *aff'd on other grounds*, 64 M.J. 348 (C.A.A.F. 2007). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. While this is a high standard, the phrase "beyond a reasonable doubt" does not imply that the evidence must be free from conflict. *Rankin*, 63 M.J. at 557 (citation omitted).

*1. Article 124, UCMJ – Maiming*

There are three elements to Article 124, UCMJ:

(1) That the accused inflicted a certain injury upon a certain person;

(2) That this injury seriously disfigured the person's body, destroyed or disabled an organ or member, or seriously

---

[38] "The necessity prong 'essentially creates a best evidence requirement'" *Wellington* 58 M.J. at 425 (quoting *United States v. Kelly*, 45 M.J. 275, 280 (C.A.A.F. 1996)).

[39] Once the Sixth Amendment's Confrontation Clause is satisfied, reliability may be established by the circumstances surrounding the making of the statement being offered as residual hearsay. *Wellington* 58 M.J. at 425 (citing *United States v. Morgan* 40 M.J. 405, 409 (C.M.A. 1994) (additional citation omitted).

diminished the person's physical vigor by the injury to an organ or member; and

(3) That the accused inflicted this injury with an intent to cause some injury to a person.[40]

The appellant asserts that the government failed to prove beyond a reasonable doubt that he intended to cause an injury to AH.[41] The appellant argues that AH's statements of "Daddy burned my feet" are "ambiguous" and permit a more reasonable inference that the appellant accidently allowed the water to get too hot.[42] We concur that, standing alone, AH's explanation of how her feet got burned does not prove specific intent. A child of AH's age and intellect may very well not be able to articulate whether her care-taker's conduct is intentional or accidental. However, AH's explanation does not stand alone in this case, and intent to inflict injury may be established through circumstantial evidence. *See e.g., United States v. Allen*, 59 M.J. 515, 535 (N-M. Ct. Crim. App. 2003) ("[t]he intent to inflict great bodily harm may be established through circumstantial evidence") (citing *United States v. Littlehales,* 19 M.J. 512, 516 (A.F.C.M.R. 1984), *aff'd*, 22 M.J. 17 (C.M.A. 1986), *cert. denied*, 476 U.S. 1174 (1986)).

The intent element of maiming requires only that the appellant have intended to inflict some injury to AH, not that he intended to cause the specific injuries suffered. *United States v. Shaw*, No. 200600728, 2007 CCA LEXIS 98, *7 (N-M. Ct. Crim. App. 22 Mar 2007). We find the forensic interview of AH persuasive in establishing the appellant's motive and intent. The appellant was mad at AH for not listening to him, and as punishment for her disobedience he placed her in a bathtub of hot water with the specific intent to inflict injury through some level of painful burning to her skin. We also find that the evidence established that AH would have felt her feet burning and was capable of removing herself from the bathtub. Further, we are not persuaded by the appellant's argument suggesting AH turned up the hot water and, despite the pain, remained in the bathtub long enough[43] to

---

[40] MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (2016 ed.), Part IV, ¶ 50b.

[41] Appellant's Brief of 26 Jan 2017 at 21.

[42] *Id*. at 22.

[43] The record established that the highest hot water temperature in the bathtub was tested and found to be 118 degrees. Record at 113. People start feeling pain in water heated above 105 degrees. *Id*. at 193. Burns will occur in adults after about 3 minutes in water that is 123 degrees. However, the time it takes for a child to burn in 123 degree water would be approximately a quarter to half the time it takes adults to burn. *Id*.

suffer the second and third degree burns to her feet that were a "serious injury of a substantially permanent nature."[44]

We are convinced beyond a reasonable doubt that the appellant intended to cause AH pain through injury, resulting in the child's severely burned feet and legs.

*2. Article 134, UCMJ – Child endangerment*

Child endangerment under Article 134, UCMJ, has the following elements:

> (1) That the accused had a duty for the care of a certain child;
>
> (2) That the child was under the age of 16 years;
>
> (3) That the accused endangered the child's mental or physical health, safety, or welfare through design or culpable negligence; and
>
> (4) That under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.[45]

The appellant asserts that the government failed to prove beyond a reasonable doubt that he endangered AH's health through design or culpable negligence.[46] Culpable negligence includes "a negligent act or omission accompanied by a culpable disregard for the foreseeable consequences."[47] "Actual physical or mental harm to the child is not required. The offense requires that the accused's actions reasonably could have caused physical or mental harm or suffering."[48] We have reviewed the evidence, and find it factually sufficient to support the appellant's conviction for child endangerment.

---

[44] MCM, Part IV, ¶ 50c(1). The burns to AH's feet required multiple operations, and as AH's feet grow and expand, she will require continued medical monitoring for scarring and loss of normal mobility. There are additional medical concerns regarding her ability to sense and tolerate heat on the tops of her feet for the remainder of her life, as well as the likely need for plastic surgery. Record at 193-94.

[45] MCM, Part IV, ¶ 68a.b.(1)-(4).

[46] Appellant's Brief at 23.

[47] MCM, Part IV, ¶ 68a.c.(3)

[48] *Id.* at ¶ 68a.c.(4).

The government's theory of liability was that the appellant, through design or culpable negligence, showed a disregard for AH's pain.[49] In determining culpable negligence, we review the appellant's actions or inactions to determine whether, "in the light of human experience, [they] might foreseeably result in harm to a child[.]"[50] "The duty of care is determined by the totality of circumstances[.]"[51]

The appellant initially treated AH with a blanket, burn creams, and a fan to cool her feet. It is clear from these actions—and from the appellant's statements to LCpl TW—that he recognized AH had been burned by the hot water, was suffering, and in need of medical treatment. Moreover, the appellant claimed to have found AH unconscious and in need of CPR, claims that would reasonably suggest the immediate need for professional medical assistance. He also admitted to using pins to reduce the swelling in AH's burn blisters. These actions demonstrate that his decision to not immediately seek professional medical assistance was intentional and freely made in consultation with AH's mother and his mother-in-law. The record supports a finding that his inaction was based on avoiding trouble for himself and not in furtherance of providing medical care to AH. The testimony of the military witnesses who first observed AH's injuries was compelling and consistent with regard to their immediate recognition of the serious nature of the burns and the need for professional emergency medical treatment. Moreover, the surgeon who treated AH testified that the delay in her treatment prolonged her pain: "The bigger risk really is the pain control aspect. The emotional aspect of it, which is getting the pain under control, and potentially sedation . . . medications to calm somebody down."[52]

Based on the facts of this case, we find the appellant had a duty to provide professional medical care for AH. The appellant endangered AH's physical health through culpable negligence by failing to obtain immediate professional medical care for her, and AH suffered prolonged pain as a result.

Given the totality of the circumstances and recognizing that we did not see or hear the witnesses, we are convinced of the appellant's guilt of maiming and child endangerment beyond a reasonable doubt. *See Rankin*, 63 M.J. at 557 (citation omitted).

---

[49] Record at 273-74.

[50] MCM, Part IV, ¶ 68a.c.(3).

[51] *Id.* at ¶ 68a.c.(7).

[52] Record at 191.

### III. CONCLUSION

The findings and sentence are affirmed.

Senior Judge HUTCHISON and Judge FULTON concur.

For the Court

R.H. TROIDL
Clerk of Court